# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 09-50367

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 20, 2010

Lyle W. Cayce
Clerk

RAUL MEZA,

Plaintiff-Appellee - Cross-Appellant

v.

DIRECTOR BRAD LIVINGSTON, Executive director of the Texas Department of Criminal Justice, in his official capacity; DAVID GUTIERREZ; CHARLES AYCOCK; CONRITH DAVIS; JACKIE DENOYELLES; THOMAS LEEPER; JUANITA GONZALEZ; RISSIE L. OWENS; STUART JENKINS;

Defendants-Appellants - Cross-Appellees

Appeals from the United States District Court for the
Western District of Texas

Before DAVIS, WIENER, and SOUTHWICK, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Texas parolee Raul Meza, who has never been convicted of a sex offense, sued the defendants, all employees of the Texas Board of Pardons and Paroles ("the Board") and the Texas Department of Criminal Justice–Parole Division ("the Department"), for violations of his right to due process after the defendants attached sex offender conditions to his mandatory supervision. This court has made clear that sex offender conditions may only be imposed on individuals not convicted of a sex offense after the individual has received due process. *Coleman*

No. 09-50367

*v. Dretke*, 395 F.3d 216 (5th Cir. 2004) (*Coleman I*), *reh'g and en banc denied*, 409 F.3d 665 (5th Cir. 2005) (*Coleman II*). Meza alleges that before sex offender conditions were attached to his mandatory supervision, inadequate process was provided. Thus, this case requires us to determine whether the process utilized by the defendants in this case is constitutionally sufficient.

We agree with the district court that the current procedures do not pass constitutional muster. However, we do not agree that Meza is owed all of the process afforded by the district court.

I.

In 1982, Meza pleaded guilty to the murder of a nine-year-old girl and was sentenced to thirty years imprisonment.[1] While in prison, Meza was sentenced to an additional four years in prison for possession of a deadly weapon in a penal institution.

In 1993, Meza was released from custody and placed under mandatory supervision.[2] In 1994, Meza violated the conditions of his supervision by returning home fifteen minutes after the state-imposed curfew. The State revoked Meza's mandatory supervision and re-incarcerated him until 2002.

In 2002, Meza was re-released from prison under mandatory supervision. TEX. GOV'T CODE § 508.0441(a)(2) provides that "Board members and parole commissioners shall determine: . . . conditions of parole or mandatory supervision, including special conditions . . . ." Using this authority to impose

---

[1] Meza was convicted of aggravated robbery in 1977 and was released on parole in 1981. He was out on parole when he committed the murder in 1982.

[2] At the time Meza was convicted, Texas penal law provided that a prisoner must be released on mandatory supervision when the length of his calendar time in prison plus good-conduct time earned equaled the total length of his sentence. *See* 1977 Tex. Gen. Laws 925 (currently embodied in TEX. GOV'T CODE § 508.001, *et seq.*). The Board had no discretion in whether Meza was released on mandatory supervision.

No. 09-50367

"special conditions," the Board placed more restrictive conditions on Meza than it imposed in 1993, including Super Intensive Supervision Program condition,[3] Special Condition O.06,[4] Special Condition O.99,[5] Special Condition M, and Special Condition X.  Special Condition X required, among other things, that Meza participate in sex offender therapy.[6]  Special Condition M required that Meza register as a sex offender.  Meza was required to register as a sex offender in 2002 when he was released on mandatory supervision.  The condition that he

---

[3] The Super Intensive Supervision Program condition requires Meza to live in a community residential facility for 180 days, comply with the facility rules, attend educational and vocational training classes, not go within 500 feet of places where children commonly gather ("child-safety zones"), and wear an electronic-monitoring device at all times.

[4] The Special Condition O.06 requires, among other things, that Meza not enter child-safety zones.

[5] The Special Condition O.99 prohibits Meza from leaving the Travis County Correctional Complex ("TCCC") without a supervising parole officer.

[6] Under Special Condition X, the Board may require that the parolee:  (1) must participate in the Sex Offender Therapy Program; (2) cannot participate in programs that include as participants individuals 17 years of age or younger; (3) may have no unsupervised contact with any person 17 years of age or younger; (4) cannot reside with any person 17 years of age or younger unless approved in writing by a supervising parole officer; (5) cannot leave the county of residence without written permission of a supervising parole officer; (6) may not date, marry, or engage in a platonic relationship with any person who has children 17 years of age or younger unless approved in writing by a supervising parole officer; (7) must be electronically monitored; (8) may not enroll in, attend, be employed by, or volunteer for an institution of higher learning without Board approval; (9) may not own, maintain, or operate computer equipment without written permission of a supervising parole officer; (10) may not own, maintain, or operate photographic equipment without written permission of a supervising parole officer; (11) must notify any prospective employer in writing regarding criminal history if directed to by a supervising parole officer; (12) be evaluated to determine need for sex offender counseling; (13) may not be employed by or attend any sexually-oriented business; (14) may not intentionally or knowingly communicate with the victim or guardian of the victim of the instant offense; (15) may not participate in any volunteer activities without prior written approval of a supervising parole officer; (16) may not view, possess, or purchase any literature or videos that depict sexually-explicit images, or communicate through any telecommunication device for sexually-explicit purposes; (17) submit to a search of the person, motor vehicle, residence, and property by a supervising parole officer; (18) submit to polygraph examinations; and (19) abide by an established curfew.  All of these conditions were imposed on Meza.

register as a sex offender was lifted in April 2005. Today, Meza is no longer required to register as a sex offender.

These sex offender conditions were imposed on Meza by the Board because Meza allegedly sexually assaulted the nine-year-old girl he murdered in 1982. It is unclear from the record how the Board obtained evidence that Meza sexually assaulted his victim in 1982, but it is undisputed that Meza was never convicted of a sexual offense.

Because of the sex offender and other conditions attached to Meza's mandatory supervision, Meza has been unable to leave TCCC since his release from prison in 2002, despite the fact that the conditions of his mandatory supervision only required that he remain at TCCC for 180 days. In order for Meza to leave TCCC, he must arrange for a residence, which, in turn, requires him to secure employment. Thus far, Meza has been unable to secure employment. Part of the reason Meza alleges that he has been unable to secure employment is because of the conditions imposed on him by the Board. To leave TCCC, Meza must be escorted by a parole officer. The Department controls the availability of parole officers. Between 2002 and 2005, Meza was only allowed to leave TCCC twice: once for a job interview and once to visit a hospital emergency room. Meza must also obtain approval for any job prospects from his parole officer. Meza has thus far been denied all job prospects by his parole officer. He was denied one job prospect because of its proximity to a child-safety zone.[7] He was denied another job prospect because he would have to cross a child-safety zone to reach the job site. He was denied another job prospect because it required that Meza have a driver's license and the Parole Division Director for Meza's region would not allow Meza to obtain a driver's license at the time of the application. Meza was not allowed to apply for one job because

---

[7] The job was a clerical position on the tenth floor of a downtown office building. The child-safety zone was located across the street.

the Department would not allow Meza to undergo a urinalysis, as was required in the application process.[8]

In 2004, this court released its opinion in *Coleman v. Dretke*, 395 F.3d 216 (5th Cir. 2004) (*Coleman I*), *reh'g and en banc denied*, 409 F.3d 665 (5th Cir. 2005) (*Coleman II*). *Coleman I* held that if a defendant is not convicted of a sex offense, the defendant's parole may only be conditioned on sex offender registration and therapy if the defendant is "afforded a hearing meeting the requirements of due process" in which it is determined that the defendant "constitute[s] a threat to society by reason of his lack of sexual control." *Id.* at 225. At the time *Coleman I* was decided, Meza was required to register as a sex offender and attend sex offender therapy.

In light of *Coleman I*, the Texas Board developed a procedure for providing due process to individuals who were not convicted of a sex offense but could have sex offender conditions attached to their parole or mandatory supervision under Texas law. Counsel for the Board developed the following process. First, the Board provides written notice to the parolee that his parole or mandatory supervision may be conditioned on sex offender registration and treatment.[9] The parolee has thirty days to respond with any written statements or documents to contest imposition of this condition. Upon the parolee's response (or lack thereof), the Department puts together a packet on the parolee. The packet

---

[8] The reason Meza was not allowed to undergo a urinalysis was that Mesa would have to travel through a child-safety zone in order to reach the location where he was to take the urinalysis. Meza's attorney filed a complaint with the Department about not allowing Meza to undergo a urinalysis, but the Department never responded to the complaint. The Parole Division Director for Meza's region testified at trial that he did not think the complaint needed a response.

[9] At oral argument, the defendants stated that the initial recommendation that sex offender conditions should be imposed on an individual's parole or mandatory supervision is made by the parole officer. There is no requirement that there be evidence of past or present sexual deviancy in order for the parole officer to make this initial recommendation.

includes the parolee's complete parole file, psychological evaluations, polygraph tests, and social, education, employment, and medical histories, etc. Neither the parolee nor any attorney he retains is allowed to see the packet. The Department sends the packet to a panel of the Board. A representative from the Department offers a short presentation (ten to thirty minutes) of the packet and the parolee's background to the Board. Neither the parolee nor his attorney is allowed to attend the panel's hearing or present facts or arguments on behalf of the parolee to the panel. After hearing the Department's presentation and reviewing the packet, the Board votes on whether the parolee's parole or mandatory supervision should be conditioned on sex offender registration or therapy. The parolee is then notified of whether sex offender registration or therapy is required. The panel does not produce any written findings or inform the parolee of the facts on which the Board based its decision. The parolee may not appeal the Board's decision.

In February 2005, Meza received notice that his mandatory supervision might be conditioned on sex offender registration and therapy. Meza was given thirty days to submit a statement or documentation to contest the imposition of sex offender conditions. He did not submit any statement or documentation. After reviewing Meza's packet as prepared by the Department, the Board panel conditioned his mandatory supervision conditioned on sex offender registration and therapy. The Board subsequently notified Meza of its decision.

In 2005, Meza brought this § 1983 action for injunction against members of the Department and a number of individual parole officers in their official capacities (collectively, "the defendants"). The suit sought to enjoin the defendants from imposing sex offender conditions without due process and from continuing to subject him to qualitatively different conditions of confinement without due process. Meza also alleged violations of his Fourteenth Amendment equal protection rights. Finally, Meza sought attorney's fees and costs.

No. 09-50367

The district court found that *Coleman I* required that a parolee such as Meza who was not convicted of a sex crime receive procedural due process before any sex offender condition could be imposed.  The district court found that the procedural protections given to Meza by the Board were constitutionally insufficient and delineated the minimum due process Meza was entitled to receive as follows:

> (1) written notice in advance of the hearing; (2) disclosure of the evidence on which the State is relying; (3) a hearing, scheduled sufficiently after the notice to permit Meza to prepare, at which he will have the opportunity to be heard in person, represented by counsel, and to present documentary evidence in his support; (4) an opportunity at the hearing to call witnesses and confront and cross examine State witnesses, "except upon a finding, not arbitrarily made, of good cause for not permitting each as to a particular witness"; (5) an independent decision maker; and (6) a written statement by the fact-finder as to the evidence relied upon and the reasons for the decision.

*Meza v. Livingston*, 623 F. Supp. 2d 782, 796 (W.D. Tex. 2009) (citation omitted). Because the Board failed to provide Meza with that level of process, the district court ordered the Board to provide Meza with an appropriate hearing consistent with its guidelines before imposing sex offender conditions on his parole.  The district court dismissed without prejudice Meza's remaining claims, awarded Meza costs for the prosecution of his case, and dismissed the defendants' motion for summary judgment.

The defendants timely appealed the district court's order.  Meza also timely filed a cross-appeal.

We review the constitutional issues presented in these appeals *de novo*, *United States v. Locke*, 482 F.3d 764, 766–67 (5th Cir. 2007) (citations omitted),

No. 09-50367

and the grant of an injunction for abuse of discretion, *Lake Charles Diesel, Inc. v. General Motors Corp.*, 328 F.3d 192, 195 (5th Cir. 2003) (footnote omitted).

## II.

Procedural due process under the Fourteenth Amendment of the United States Constitution is implicated where an individual is deprived of life, liberty, or property, without due process of law.  U.S. CONST. amend. XIV, § 1, cl. 3.  The Supreme Court has adopted a two-step analysis to examine whether an individual's procedural due process rights have been violated.  The first question "asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient."  *Kentucky Dept. of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted).

## A.

The district court held that an individual has a liberty interest such that due process is implicated when there is "any State sex-offender condition imposed on a parolee who has not been convicted of a sex crime."  *Meza*, 623 F. Supp. 2d at 792.  The defendants do not dispute that Meza has a liberty interest in being free from sex offender registration and therapy, but they maintain that Meza does not have a liberty interest in being free from the other conditions that the Board may attach to his mandatory supervision under Special Condition X. Additionally, the defendants argue that sex offender registration is not at issue in this case because Meza was only required to register as a sex offender from 2002 to 2005; he is no longer required to register as a sex offender.

Meza counters that the Board misreads the district court's opinion as finding a liberty interest in all sex offender conditions that may be imposed under Special Condition X.  Instead, Meza argues that the only sex offender conditions in which he has a liberty interest are those which require that he (1)

8

participate in a sex offender treatment program, (2) be evaluated for sex offender counseling, (3) submit to polygraph examinations, and (4) be labeled as a sex offender. Meza also disagrees with the defendants' position that sex offender registration is not at issue. According to Meza's attorney at oral arguments, "the parole office considers Meza to be a sex offender . . . . The Department tells Mr. Meza's potential employers that he is a sex offender." Thus, Meza asserts that while he currently is not required to put his name on the sex offender registry, the Department continues to operate as if his name were on the sex offender registry.

As an initial matter, we agree with Meza that sex offender registration is a condition at issue in this case. We reach this conclusion for two reasons. First, it is impossible for the defendants to un-ring the bell that was rung when Meza was required to register as a sex offender. The stigma that attached to Meza when he was required to register remains, regardless of whether his name is currently on a sex offender registry. *See Coleman II*, 409 F.3d at 668 ("The stigma aspect of the case is thus not mooted by the state's decision to remove Coleman from its sex offender registry."). The stigmatizing effects of registering as a sex offender still follow Meza and are reinforced by the Department when it continues to tell Meza's potential employers that he is a sex offender.

Second, sex offender registration is of concern in this case because "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice," even in cases in which injunctive relief is sought. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982); *accord Northeastern Fla. Chapter of Assoc. Gen Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 661–62 (1993); *Cooper v. McBeath*, 11 F.3d 547, 550–51 (5th Cir. 1994); *Resident Council of Allen Parkway Village v. United States Dep't of Housing & Urban Dev.*, 980 F.2d 1043, 1048 (5th Cir. 1993). It is clear that the alleged wrongful behavior of the

9

Board—requiring Meza to register as a sex offender without due process of law—could recur to Meza if his mandatory supervision is revoked again. Moreover, at trial, an Administrator for the Board testified that as many as 6,900 current inmates are subject to have sex offender conditions, including sex offender registration, imposed upon them in the future, despite the fact that they have not been convicted of a sex crime. Thus, the Board may continue to use the same procedures for these 6,900 inmates that Meza complains of in this case. If the Board removes the registration requirement before the court can review the adequacy of the process, the Board's practice will remain in effect and evade court review.

Having determined that sex offender registration and therapy are at issue in this case, we find it is unnecessary to examine whether Meza has a liberty interest in any of the other sex offender conditions. Meza alleges he has a liberty interest in being required to (1) participate in a sex offender treatment program, (2) be evaluated for sex offender counseling, (3) submit to polygraph examinations, and (4) be labeled as a sex offender. Based on the Department's Policy and Operating Procedure entitled "Sex Offender Treatment and Polygraph Examination Guidelines" that was submitted into evidence, as well as the *Coleman I* court's description of sex offender therapy, *see* 395 F.3d at 224, being evaluated for sex offender counseling and submitting to polygraph examinations may be considered part of sex offender treatment. Thus, the conditions complained of by Meza fall into two categories: sex offender registration and sex offender counseling. As these are the only sex offender conditions that Meza asserts he may have a liberty interest in, we find it unnecessary to determine what, if any, liberty interest Meza may have in the other conditions attached to his mandatory supervision.

This court's ruling in *Coleman I* guides our decision of whether Meza has a liberty interest in sex offender registration and therapy. In *Coleman I*, the

defendant was convicted of burglary in 1986. He was released on parole in 1991. While on parole, the defendant was indicted for aggravated sexual assault of a child and indecency with a child by contact. The defendant pleaded guilty to and was convicted of misdemeanor assault. He was never convicted of any sex offense. Thereafter, the defendant's parole was revoked and he was reincarcerated.

In January 2001, the *Coleman I* defendant was released on mandatory supervision. In February 2001, the parole panel imposed two requirements on the defendant's parole: first, he had to register as a sex offender, and second, he had to attend sex offender therapy. The defendant was not given advance notice of the hearing in which the parole panel imposed these requirements. The defendant registered as a sex offender, but did not attend sex offender therapy. Because the defendant violated the terms of his parole, his parole was revoked in July 2001.

The defendant challenged his parole revocation in a habeas petition, alleging a violation of the Due Process Clause of the Fourteenth Amendment. Relying primarily on *Vitek v. Jones*, 445 U.S. 480 (1980), we held that "prisoners who have not been convicted of a sex offense have a liberty interest created by the Due Process Clause in freedom from sex offender classification and conditions." *Coleman I*, 395 F.3d at 222. The court found a liberty interest existed because sex offender registration and therapy were highly stigmatizing and invasive conditions that were "qualitatively different" from other conditions regularly attached to parole. *Id.* at 223. Because the State admitted it provided the defendant with no procedural protections, this court found that the defendant's due process rights were violated. We noted, however, that the State was "not precluded from further efforts to add these same conditions to [the defendant's] parole upon proper notice . . . ." *Id.* at 225.

11

No. 09-50367

Based on *Coleman I*, it is clear that Meza had a liberty interest in being free from being required to register as a sex offender and participate in sex offender therapy. Other circuits have reached this same conclusion. *E.g., Gwinn v. Awmiller*, 354 F.3d 1211, 1217 (10th Cir. 2004); *Kirby v. Siegleman*, 195 F.3d 1285, 1291–92 (11th Cir. 1999); *Neal v. Shimoda*, 131 F.3d 818, 829–30 (9th Cir. 1997).[10]

B.

Given that Meza has a liberty interest in being free from sex offender registration and therapy, we now examine whether the procedures provided by the defendants to Meza were constitutionally sufficient. *Thompson*, 490 U.S. at 460 (citations omitted).

When an individual is convicted of a sex offense, no further process is due before imposing sex offender conditions. *See Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7–8 (2003); *Jennings v. Owens*, __ F.3d __, 2010 WL 1267163 (5th Cir. 2010). The individual "convicted of a sex crime in a prior adversarial setting, whether as the result of a bench trial, jury trial, or plea agreement, has received the minimum protections required by due process." *Neal*, 131 F.3d at 831. Meza, however, was not convicted of a sex offense, and he neither

---

[10] The Eighth Circuit found that under a particular Minnesota statute no due process is required to impose sex offender conditions on an individual's probation, despite the fact that the individual has not been convicted of a sex offense. *See Gunderson v. Hvass*, 339 F.3d 639, 644–45 (8th Cir. 2003). Minnesota statute § 243.166 provides that a "person shall register [as a sex offender] if . . . the person was charged with . . . and convicted of [criminal sexual conduct under section 609.342] or another offense arising out of the same set of circumstances." In *Gunderson*, the alleged sex offender was originally charged with sexual assault, but negotiated a plea agreement for third degree assault. The Eighth Circuit found that because the third degree assault conviction arose from the same set of circumstances as the alleged sexual assault, the alleged sex offender met the statutory criteria for being required to register as a sex offender.

We see no indication the Eighth Circuit would reach this result in Meza's case because Texas does not have a statute similar to the Minnesota statute. Even if Texas did have a similar statute, Meza was not charged with or convicted of a sex offense so the State could not prove that he was charged with a non-sex offense that arose out of the same set of circumstances as a sex offense.

stipulated nor judicially admitted that he sexually assaulted his murder victim in 1982.[11]  Thus, under our cases, he is owed procedural due process before sex offender conditions may attach.  *See Coleman I*, 395 F.3d at 221.

Thus far, the previously described procedure provided by the Board is the only process Meza has received.  To determine whether this process meets constitutional muster, we rely on the balancing test in *Mathews v. Eldridge*, 424 U.S. 319 (1976).  The *Mathews v. Eldridge* balancing test offers three distinct factors for a court to weigh in considering whether the procedural due process provided is adequate:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335 (citation omitted).

The first factor is the private interest affected.  "Courts are in agreement that imposing a sex offender registration requirement and treatment affects a substantial right, because it compels a serious deprivation of liberty and creates stigmatizing consequences."  *United States v. Jimenez*, 275 F. App'x 433, 442 (5th Cir. 2008) (citing *Coleman II*, 409 F.3d at 668; *Neal*, 131 F.3d at 829) (unpublished).  "We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex

---

[11] According to the joint agreed stipulated facts, Meza only admitted that he sexually assaulted his victim as part of his sex offender treatment.  According to Meza's attorney at oral argument, Meza was required to make this admission as part of his treatment.  Meza's attorney stated, "If Mr. Meza did not make that admission during the sex offender treatment, his parole would have been revoked and he would have been returned to prison for refusing to take part in the treatment process."  The State did not dispute this statement.

offender." *Neal*, 131 F.3d at 829 (9th Cir. 1997). Based on cases from this court and other circuits, we are convinced that Meza has a significant interest in being free from sex offender registration.

The defendants seek to minimize any interest Meza has in being free from sex offender therapy. In *Coleman II*, this court equated the consequences of being required to attend sex offender therapy with the consequences of being required to register as a sex offender. "[B]y requiring [a parolee] to attend sex offender therapy, the state label[s] him a sex offender—a label which strongly implies that [the parolee] has been convicted of a sex offense and which can undoubtedly cause 'adverse social consequences.'" *Coleman II*, 409 F.3d at 668 (quoting *Vitek*, 445 U.S. at 492). The consequences of attending sex offender therapy, combined with the highly invasive nature of the therapy,[12] leave us no doubt that Meza also had a significant interest in being free from sex offender therapy.

The second factor is the risk of erroneous deprivation. Under the current Texas system there is a high risk that the Board will make erroneous findings because the parolee is kept in the dark about the evidence being considered by the Board in reaching its decision. Critically, the parolee has no opportunity to correct errors in the packet provided to the Board. Damning information may incorrectly be placed in the wrong parolee's packet. Facts may be erroneously

---

[12] Meza has undergone sex offender therapy similar to the therapy prescribed for the parolee in *Coleman I*. The *Coleman I* court described sex offender therapy as follows:

> "[S]ex offender treatment is different than traditional psychotherapy in that treatment is mandated, confrontational, structured, victim centered, focused on behaviors, and confidentiality is not maintained." Treatment can include "interventions with psychopharmacological agents," polygraph exams to determine sexual history, and use of penile plethysmographs to "modify deviant sexual arousal and enhance appropriate sexual arousal."

*Id.* at 224 (quoting the Council for Sex Offender Treatment's website); *accord Jennings*, __ F.3d at __ n.8, 2010 WL 1267163, at *4.

14

or unfairly slanted against the parolee. Under the current procedure, the parolee has no opportunity to correct false information or provide an explanation for any adverse information. Neither the parolee nor his attorney may even see the completed evidentiary packet on which the Board bases its decision of whether to require the parolee to register as a sex offender and attend sex offender therapy. At trial, it was estimated that there are currently 6,900 prisoners who will potentially need to receive *Coleman* notice upon their release. In compiling 6,900 parolee packets, human error will inevitably occur and parolees may be falsely accused of sexually-deviant behavior. By simply granting the parolee the right to review his packet, such human errors could be avoided. For this reason, the current Texas system creates a high risk of erroneous deprivation.

The third factor that we must weigh in the balancing test is the Government's interest. Undoubtedly the State has a significant interest in rehabilitating sex offenders prior to their reentry into society, as well as monitoring sex offenders while on parole. *See McKune v. Lile*, 536 U.S. 24, 32–33 (2002). Also, the State certainly has an interest in keeping the costs of providing notice to individuals like Meza as low as constitutionally permissible. The Board Administrator who predicted at trial that 6,900 offenders currently incarcerated may at some point require notice pursuant to *Coleman I* also estimated that to provide these offenders with the process afforded in parole revocation hearings could cost $750,000. Therefore, requiring more procedural protections would cause the State to incur significant additional costs.

Taking the *Mathews v. Eldridge* factors into consideration, we conclude that the current procedure provided to parolees who have never been convicted of a sex offense and who face possible sex offender registration and therapy is constitutionally insufficient. While the State has a significant interest in avoiding additional costs, Meza's liberty interest in being free from the stigma

15

of registering as a sex offender and avoiding highly invasive sex offender therapy is palpable. When balancing these significant interests with the likelihood of erroneous decision-making, we are convinced that the current procedure is unconstitutional. The grave risk of error that envelops the procedures used by the Board is most troubling. By not allowing the parolee to review the evidence presented against him, he is unable to correct any misinformation placed in his packet that the Board reviews. By not allowing the parolee to appear before the Board, the Board must act without mitigating or clarifying evidence from the parolee. By not allowing the parolee to confront opposing witnesses, the parolee is unable to refute damning statements made against his interest and the Board is unable to evaluate the credibility of the parolee against that of opposing witnesses.

In sum, after weighing the factors of *Mathews v. Eldridge*, we find that the current Texas procedure for providing parolees with their *Coleman* notice does not meet the constitutional requirements for procedural due process.

### III.

Having determined that the process afforded to Meza is constitutionally insufficient, we must now determine what process is required.

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "'[P]rocess' is not a term with a clear definition and the nature of the procedure required to comply with the due process clause depends on many factors concerning the individual deprivation." RONALD D. ROTUNDA & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 17.7 (4th ed. 2008). The Supreme Court has afforded a broad spectrum of process depending on the deprivation at issue. To determine the amount of process due in this case,

No. 09-50367

we first examine similar Supreme Court cases involving the deprivation of rights of prisoners and parolees.

A.

In 1972, the Supreme Court issued the landmark decision *Morrissey v. Brewer*, in which the Court determined that parolees had a liberty interest in avoiding parole revocation. Having found that a liberty interest was present, the Court then decided the minimum process owed to a parolee before parole may be revoked. The Court held that a parolee was owed, at a minimum:

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

*Morrissey*, 408 U.S. at 489. The Court specifically did "not reach or decide the question of whether the parolee is entitled to the assistance of retained counsel or to appointed counsel if he is indigent." *Id.*[13]

---

[13] The following year, in *Gagnon v. Scarpelli*, 411 U.S. 778 (1973), the Court found that the right to counsel in parole revocation hearings must be made on a case-by-case basis. The *Gagnon* Court stated:

> [T]he decision as to the need for counsel must be made on a case-by-case basis in the exercise of a sound discretion by the state authority charged with responsibility for administering the probation and parole system. Although the presence and participation of counsel will probably be both undesirable and constitutionally unnecessary in most revocation hearings, there will remain certain cases in which fundamental fairness—the touchstone of due process—will require that the State provide at its expense counsel for indigent probationers or parolees.

*Id.* at 790.

17

No. 09-50367

Two years after *Morrissey*, in *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Court examined the procedural due process protections owed to an inmate in prison disciplinary proceedings that could result in the loss of the inmate's good-time credits. The Court held that the inmate was owed: (1) written notice of the claimed violation that enables the inmate to marshal the facts and prepare a defense; (2) an opportunity "to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals"; and (3) a "written statement by the factfinders as to the evidence relied on and reasons for the disciplinary action." *Id*. at 563–66. The Court also recognized that the committee that conducted the prisoner disciplinary proceedings was sufficiently impartial, implying that such impartiality was a requirement of due process. *Id*. at 570–71. Finally, the *Wolff* Court found that an inmate was *not* entitled to confront and cross-examine witnesses and did not "have a right to either retained or appointed counsel." *Id*. at 567–70.

Thus, the *Wolff* Court found that inmates facing a possible loss of good-time credits were owed less process than parolees facing a possible revocation of parole; specifically, inmates were not entitled to confront and cross-examine witnesses, while parolees in *Morrissey* were entitled to this procedural protection. Also, *Wolff* afforded inmates no absolute right to present testimony or other evidence that would compromise safety and correctional goals. In finding that parolees and inmates were not owed the same process, the *Wolff* Court noted that "one cannot automatically apply procedural rules designed for free citizens in an open society, or for parolees or probationers under only limited restraints, to the very different situation presented by a disciplinary proceeding in a state prison." *Id*. at 560. Justice White, writing for the majority, distinguished the revocation of parole—the deprivation at issue in

18

No. 09-50367

*Morrissey*—from the loss of good-time credits—the deprivation at issue in *Wolff*—by stating:

> Revocation of parole may deprive the parolee of only conditional liberty, but it nevertheless "inflicts a 'grievous loss' on the parolee and often on others." Simply put, revocation proceedings determine whether the parolee will be free or in prison, a matter of obvious great moment to him.  For the prison inmate,  the deprivation of good time is not the same immediate disaster that the revocation of parole is for the parolee.  The deprivation, very likely, does not then and there work any change in the conditions of his liberty. . . . The deprivation of good time is unquestionably a matter of considerable importance.   The State reserves it as a sanction for serious misconduct,  and  we  should  not  unrealistically  discount  its significance.   But it is qualitatively and quantitatively different from the revocation of parole or probation.

> In striking the balance that the Due Process Clause demands, however, we think the major consideration militating against adopting the full range of procedures suggested by *Morrissey* for alleged parole violators is the very different stake the State has in the structure and content of the prison disciplinary hearing.  That the revocation of parole be justified and based on an accurate assessment of the facts is a critical matter to the State as well as the parolee; but the procedures by which it is determined whether the conditions of parole have been breached do not themselves threaten other important state interests, parole officers, the police, or witnesses—at least no more so than in the case of the ordinary criminal trial.  Prison disciplinary proceedings, on the other hand, take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so.  Some are first offenders, but many are recidivists who have repeatedly employed illegal and often very violent means to attain their ends.  They may have little regard for the safety of others or their property or for the rules designed to provide an orderly and reasonably safe prison life.  Although there are very many varieties of prisons with different degrees of security, we must realize that in many of them the inmates are closely supervised and their activities controlled around the clock.   Guards and inmates co-exist in direct and intimate

19

contact.    Tension between them is unremitting.    Frustration, resentment, and despair are commonplace.  Relationships among the inmates are varied and complex and perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner.

*Id*. at 560–62 (citations omitted).  In discussing why inmates in particular were not owed the right to confront and cross-examine witnesses, but parolees were extended that protection, the Court said:

Confrontation and cross-examination present greater hazards to institutional interests.  If confrontation and cross-examination of those furnishing evidence against the inmate were to be allowed as a matter of course, as in criminal trials, there would be considerable potential for havoc inside the prison walls.  Proceedings would inevitably be longer and tend to unmanageability. These procedures are essential in criminal trials where the accused, if found guilty, may be subjected to the most serious deprivations, *Pointer v. Texas*, 380 U.S. 400 (1965), or where a person may lose his job in society, *Greene v. McElroy*, 360 U.S. 474, 496–497 (1959).

*Id*. at 567.

Five years after *Wolff*, the Court was again called upon to determine the amount of procedural due process owed to inmates.  In *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1 (1979), the Court answered the question of how much due process was owed to inmates when they become eligible for parole and the Board must make the purely discretionary call of granting or denying parole.  The Court stated that "[p]rocedures designed to elicit specific facts, such as those required in *Morrissey* . . . and *Wolff*, are not necessarily appropriate to a . . . parole determination."  *Id*. at 14.  The Court found that Nebraska's scheme of providing the inmate with an informal process in which the Board of Pardons and Paroles was able to interview the inmate met constitutional scrutiny:

No. 09-50367

> At the Board's initial interview hearing, the inmate is permitted to appear before the Board and present letters and statements on his own behalf. He is thereby provided with an effective opportunity first, to insure that the records before the Board are in fact the records relating to his case; and second, to present any special considerations demonstrating why he is an appropriate candidate for parole. Since the decision is one that must be made largely on the basis of the inmate's files, this procedure adequately safeguards against serious risks of error and thus satisfies due process.

*Id*. at 15. The Court found that the Parole Board was not required to provide a formal hearing or "to specify the particular 'evidence' in the inmate's file or at his interview on which it rest[ed] the discretionary determination" on, because such would "provide at best a negligible decrease in the risk of error." *Id*. at 14–16.

The Court again assessed the amount of process due to another class of inmates the following year in *Vitek v. Jones*, 445 U.S. 480 (1980). In *Vitek*, a Nebraska statute allowed for an inmate to be involuntarily transferred to a mental hospital after a physician found that the inmate suffered from a mental disease or defect and could not be given proper treatment in the prison. *Id*. at 483. Before being transferred under the Nebraska statute, prisoners were provided with no process to contest the transfer. The prisoner in *Vitek* challenged the constitutionality of the statute, arguing that he had a liberty interest implicating the Due Process Clause of the Fourteenth Amendment in not being transferred to a mental hospital.

The *Vitek* Court agreed that the prisoner had a liberty interest, stating that "the stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness, constitute the kind of deprivations of liberty that requires procedural protections." *Id*. at 494. Upon reaching that conclusion, the Court found that the prisoner was owed

21

the following process before he could be transferred to a mental hospital: (1) written notice that a transfer to a mental hospital was being considered; (2) a hearing, sufficiently after the notice, at which disclosure to the prisoner was made of the evidence being relied upon and at which an opportunity to be heard in person and to present documentary evidence was given; (3) an opportunity at the hearing to present testimony of witnesses by the defense and to confront and cross-examine witnesses called, unless good cause was shown for why such confrontation and cross-examination should not be permitted; (4) an independent decision maker; (5) a written statement by the fact finder as to the evidence relied on and the reasons for action; (6) the availability of qualified and independent assistance, which may be an attorney, but need not be; and (7) effective and timely notice of all the foregoing rights. *Id.* at 494–95 (majority opinion), 499–500 (Powell, J., concurring). Thus, except for the right to counsel, the *Vitek* Court granted the inmate facing involuntary transfer to and confinement in a mental hospital the full panoply of due process rights available to a defendant facing a criminal trial. This exceeded the process allowed the inmate seeking discretionary parole in *Greenholtz*, the inmate facing the loss of good-time credits in *Wolff*, and even the parolee facing possible parole revocation in *Morrissey*.

Four of the Justices were persuaded that the inmate in *Vitek* had a right to counsel. Writing for the plurality, Justice White stated:

> The District Court did go beyond the requirements imposed by prior cases by holding that counsel must be made available to inmates facing transfer hearings if they are financially unable to furnish their own. We have not required the automatic appointment of counsel for indigent prisoners facing other deprivations of liberty, but we have recognized that prisoners who are illiterate and uneducated have a greater need for assistance in exercising their rights. A prisoner thought to be suffering from a mental disease or

> defect requiring involuntary treatment probably has an even greater need for legal assistance, for such a prisoner is more likely to be unable to understand or exercise his rights. In these circumstances, it is appropriate that counsel be provided to indigent prisoners whom the State seeks to treat as mentally ill.

445 U.S. at 496–97 (citations omitted). The majority, however, did not hold that an inmate facing involuntary mental institution had a right to counsel. Instead, the majority found that due process was satisfied by providing the inmate the assistance of a "qualified and independent adviser who is not a lawyer." *Id.* at 499 (Powell, J., concurring). Justice Powell, in his concurrence, wrote:

> I do not believe, however, that an inmate must always be supplied with a licensed attorney. . . . "Due Process has never been thought to require that the neutral and detached trier of fact be law trained or a judicial or administrative officer." *Parham v. J.R.*, 442 U.S. 584, 607 (1979). In that case, we held that due process is satisfied when a staff physician determines whether a child may be voluntarily committed to a state mental institution by his parents. That holding was based upon recognition that the issues of civil commitment "are essentially medical in nature," and that "'neither judges nor administrative hearing officers are better qualified than psychiatrists to render psychiatric judgments.'" *Id.*, at 607, 609, quoting *In re Roger S.*, 19 Cal. 3d 921, 942, 569 P. 2d 1286, 1299 (1977) (Clark, J., dissenting).
>
> In my view, the principle that due process does not always require a law-trained decisionmaker supports the ancillary conclusion that due process may be satisfied by the provision of a qualified and independent adviser who is not a lawyer.

*Id.* (citations omitted). The *Vitek* Court ultimately adopted Justice Powell's position and only afforded the inmate the assistance of a qualified and independent advisor. *Id.* at 497 (majority opinion).

Reading these four principal procedural due process cases clarifies the spectrum of due process rights that the Court has developed. On one end of the

spectrum is the consideration of discretionary parole in *Greenholtz* in which the Court afforded minimal due process consisting essentially of an interview of the inmate who has an opportunity to verify that the Board has his correct file before it. In *Wolff*, when faced with the deprivation of good-time credits, the Court granted the inmate slightly more procedural protections, including notice of the violation and a limited right to present evidence at a hearing if safety and correctional goals of the institution are not compromised. The Court found that even more process was owed in *Morrissey* when the deprivation at issue concerned parole revocation. And finally, in *Vitek*, except for the right to counsel, the Court determined that the full panoply of due process was required before involuntarily transferring a prisoner to a mental institution.

The Court has crafted this spectrum based on the specific factors surrounding the deprivation at issue. When deprivation of the liberty interest leads to stigmatizing and physically-invasive consequences, the Court grants greater procedural protections, as it did in *Vitek*. *See Wolff*, 418 U.S. at 565–66. However, where the rights of inmates are implicated, when providing additional process creates security risks or provides a negligible decrease to the risk of error, the Court is less willing to afford additional process. *See id*. at 562 (discussing security risks); *Greenholtz*, 442 U.S. at 14 (discussing risk of error). If the deprivation of liberty will cause certain, immediate adverse consequences to the parolee or prisoner, the Court provides more due process than when the deprivation of liberty is uncertain and may occur at a later date. *See Wolff,* 418 U.S. at 560–61. Because fewer security concerns are at issue and the liberty deprivations are more immediate and certain, the Court generally finds that parolees are owed more process than inmates. *See id*. at 560; *Morrissey*, 408 U.S. at 489.

B.

24

No. 09-50367

With this range of possible due process protections in mind, we must now determine where on the spectrum Meza falls.

In evaluating this spectrum, we begin by concluding that the lowest level of due process provided by the above discussed cases, the *Greenholtz* standard, to be inapplicable in this case because of the distinction between the liberty deprivations at issue. In *Greenholtz*, the Court considered the process due for resolving an inmate's claim to parole—a purely discretionary call by the Board. Meza, on the other hand, is entitled under Texas law to be released under mandatory supervision in 2002. If Meza failed to register as a sex offender between 2002 and 2005, or does not participate in sex offender therapy currently, he will immediately lose the mandatory supervision that Texas law requires he receive.

Furthermore, the nature of the rights at issue makes the instant case distinguishable from *Greenholtz*. Registering as a sex offender and participating in sex offender therapy is highly stigmatizing and invasive. Being denied discretionary parole is neither stigmatizing nor invasive. Therefore, because of the differing nature of the rights, we find that the *Greenholtz* standard is inapplicable in this case.

Having found the *Greenholtz* standard inapplicable, we next examine the liberty deprivation at issue in *Wolff*. While there are numerous differences between the loss of good-time credits and the imposition of sex offender conditions, there are also similarities. In *Wolff*, prisoners were entitled to receive good-time credits, *see Wolff*, 418 U.S. at 545 n.6, just as Meza was entitled to be released on mandatory supervision. Thus, revoking a prisoner's good-time credits and imposing sex offender conditions on parole both have the effect of inhibiting a liberty interest to which the inmate or parolee is entitled.

If Meza were an inmate instead of a parolee, the *Wolff* standard would likely apply. Two circuits have so held. *See Gwinn*, 354 F.3d at 1219; *Neal*, 131

25

F.3d at 831. Meza can claim at least the same process of an inmate, but as a parolee, he should generally be entitled to more favorable treatment than inmates. *See Wolff*, 418 U.S. at 560–62. Applying *Wolff*, we find that Meza is owed, at a minimum: (1) written notice that sex offender conditions may be imposed as a condition of his mandatory supervision, (2) disclosure of the evidence being presented against Meza to enable him to marshal the facts asserted against him and prepare a defense, (3) a hearing at which Meza is permitted to be heard in person, present documentary evidence, and call witnesses, (4) an impartial decision maker, and (5) a written statement by the factfinder as to the evidence relied on and the reasons it attached sex offender conditions to his mandatory supervision.[14]

We are persuaded that Meza is owed at least these protections because under the *Mathews v. Eldridge* balancing test, these additional procedural protections help create a constitutionally-permissible system. Disclosing to Meza the evidence to be used against him greatly decreases the possibility that the Board will rely on incorrect information inadvertently placed in Meza's packet. Allowing Meza to be heard in person decreases the possibility that the Board will misinterpret any information provided in the packet. Further, it provides the Board with the opportunity to evaluate Meza's credibility in resolving any factual disputes and allows an exchange between the Board and Meza such that the Board can consider mitigating information and evaluate Meza as a person. Providing a written statement as to the evidence relied upon by the Board promotes fairness in the process; "the provision for a written record helps to insure that administrators, faced with possible scrutiny by state officials

---

[14] We note that the Board already provides parolees with written notice that sex offender conditions may be imposed as a condition of parole. Similarly, the decision to impose sex offender conditions is currently made by the Board, an impartial decision maker. The other requirements listed here, however, are not currently part of the Board's procedures.

and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly." *Wolff*, 418 U.S. at 565.

It is true that these additional due process requirements will increase costs to the State, but these increased costs are outweighed by the serious deprivation to a parolee unjustly required to register as a sex offender or participate in sex offender therapy. Moreover, we do not find the additional costs imposed on the State to be overly burdensome given that these are the same protections the State is constitutionally required to provide to inmates facing the possible loss of good-time credits. The loss of good-time credits, as Justice White articulated, is a significant loss, but it is less significant than requiring a parolee to register as a sex offender or attend sex offender therapy. "We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender." *Coleman I*, 395 F.3d at 223 n.27 (citing *Neal*, 131 F.3d at 829). Because Meza's interest in being free from sex offender conditions is greater than an inmate's interest in good-time credits, Meza is owed, at a minimum, the same process due to inmates under *Wolff*.

In addition to the procedural protections discussed above, the district court also granted two additional due process rights that were not granted to inmates in *Wolff*: (1) the right to confront and cross-examine the State's witnesses unless good cause is shown and (2) the right to counsel. We examine each of these due process rights to determine whether they should be afforded to Meza.

In *Morrissey*, when faced with the issue of parole revocation, the Court granted the parolee the right to confront and cross-examine witnesses, unless good cause was shown for why the parolee should not be allowed this procedural protection. 408 U.S. at 489. The *Wolff* Court, however, denied inmates this right, primarily because of the security threat the inmates posed inside the prison walls. "If confrontation and cross-examination of those furnishing

27

evidence against the inmate were to be allowed as a matter of course, as in criminal trials, there would be considerable potential for havoc inside the prison walls." *Wolff*, 418 U.S. at 567. The safety concerns of *Wolff* are not present with parolees because parolees cannot wreak the same havoc within prison walls that inmates may cause. Thus, the *Wolff* rationale for not allowing confrontation and cross-examination are inapplicable in the instant case and Meza should be granted the right to confront and cross-examine adverse witnesses unless the State can show good cause in a particular case why this right should not be granted.

The district court also found that Meza was entitled to counsel. While the right to counsel is a fundamental right for individuals facing criminal charges, U.S. CONST. amend. VI, the Court has declined to find it part of the panoply of due process protections that must be automatically afforded parolees or inmates. *See Gagnon*, 411 U.S. at 790 (finding that the need for counsel at parole revocation hearings must be made on a "case-by-case basis"). In *Vitek*, when examining the due process protections that should be afforded to inmates facing involuntary confinement in a mental institution, the four members of the Court who wanted to provide all inmates facing transfer to a mental hospital a right to counsel reasoned that "[a] prisoner thought to be suffering from a mental disease or defect requiring involuntary treatment probably has an even greater need for legal assistance, for such a prisoner is more likely to be unable to understand or exercise his rights." *Vitek*, 445 U.S. at 496–97 (citations omitted).

In this case, the concerns of the plurality of the *Vitek* Court are not present. No claim is made that Meza is suffering from a mental disease that may cause him to be unable to understand or exercise his rights. Instead, he is faced with the question of whether he can control his sexual desires such that he is not a threat to society. Thus, the reasons the *Vitek* plurality would have granted a right to counsel are not present. Given the substantial cost to the

State to provide counsel to parolees facing registration and sex therapy and the Supreme Court precedent discussed above, we conclude that the State is not required to provide counsel to Meza.

In sum, we find that on the spectrum of due process rights afforded by the Court in analogous cases, requiring a parolee who has not been convicted of a sex offense to register as a sex offender or participate in sex offender therapy requires more process than was provided to the inmate in *Wolff*, but less process than was provided in *Vitek*. In other words, we find Meza is due: (1) written notice that sex offender conditions may be imposed as a condition of his mandatory supervision; (2) disclosure of the evidence being presented against Meza to enable him to marshal the facts asserted against him and prepare a defense; (3) a hearing at which Meza is permitted to be heard in person, present documentary evidence, and call witnesses; (4) the right to confront and cross-examine witnesses, unless good cause is shown why this right should not be granted; (5) an impartial decision maker (which we assume the Board will be); and (6) a written statement by the factfinder as to the evidence relied on and the reasons it attached sex offender conditions to his mandatory supervision.

## IV.

In addition to the aforementioned procedural due process claims, the defendants and Meza raise additional separate arguments on appeal.

## A.

The defendants argue that two individuals—Brad Livingston, the Executive Director of the Department, and Stuart Jenkins, the Director of the Department's Parole Division—enjoy immunity under the Eleventh Amendment and may not be sued. This argument is based on the assertion that Livingston and Jenkins work for the Department and the Department does not have the

authority to provide Meza with the type of hearing he requests.  That authority, the defendants allege, rests solely with the Board.

The State's argument is without merit.  The Department plays an integral role in determining a prisoner's mandatory supervision conditions.  The Department prepares the file reviewed by the Board.  The Department orally presents the packet to the Board.  The Department controls the implementation of many of the conditions, such as controlling when a parole officer escort is available.  Though the Board is the entity that makes the final decision regarding a parolee's conditions of parole or mandatory supervision, the Department plays a key role in helping the Board reach that determination, and thus should also be accountable for any constitutional violations that may exist.

Under *Ex Parte Young*, a state official may be sued in his official capacity for injunctive relief without violating the Eleventh Amendment.  209 U.S. 123, 159–60 (1908).  In this case, because the Department plays an integral role in determining and executing a prisoner's mandatory supervision conditions, Meza may seek injunctive relief against Livingston and Jenkins; they do not enjoy Eleventh Amendment immunity.

### B.

Meza argues that he has an equal protection claim against the defendants under the class-of-one theory.  He also asserts that he has a liberty interest in three non-sex offender conditions—(1) requiring him to reside at TCCC pursuant to the Super Intensive Supervision Program ("SISP"), (2) requiring him to have a parole escort to leave TCCC pursuant to Special Condition O.99, and (3) prohibiting him from entering "child safety zones" pursuant to SISP—as well as a liberty interest in the imposition of all of these conditions together.

The district court did not consider Meza's equal protection claim or non-sex offender due process claims.  Instead, the court stated: "Because the Court has concluded that *Coleman*'s 'appropriate hearing' mandate requires more robust

procedural protections than the State's current *Coleman* review, the Court does not today reach these remaining claims and will dismiss them without prejudice." *Meza*, 623 F. Supp. 2d at 797.

Although Meza's equal protection and due process claims for the non-sex offender conditions are not patently frivolous, they have not been developed by the district court and "[p]rudence dictates that we allow the lower court[] to consider [these] question[s] in the first instance." *Austin v. United States*, 509 U.S. 602, 622–23 (1993); *accord United States v. 92,203.00 in United States Currency*, 537 F.3d 504, 510 (5th Cir. 2008). Thus, we vacate the district court's dismissal without prejudice on these claims and remand those issues to the district court to decide in the first instance.

## CONCLUSION

For the forgoing reasons, we find that Meza has a liberty interest in being free from sex offender registration and therapy, and this interest is significant. When Meza's interest is balanced against the State's significant interest in not incurring additional costs, and the high risk of error that may occur based on the State's current due process protections, we find that the State's procedures do not satisfy constitutional due process. Instead, the State must afford Meza the following procedure: (1) written notice that sex offender conditions may be imposed as a condition of his mandatory supervision; (2) disclosure of the evidence being presented against Meza to enable him to marshal the facts asserted against him and prepare a defense; (3) a hearing at which Meza is permitted to be heard in person, present documentary evidence, and call witnesses; (4) the right to confront and cross-examine witnesses, unless good cause is shown; (5) an impartial decision maker; and (6) a written statement by the factfinder as to the evidence relied on and the reasons it attached sex offender conditions to his mandatory supervision. Additionally, we find that

31

defendants Livingston and Jenkins do not enjoy qualified immunity under the Eleventh Amendment.

As such, we AFFIRM the district court's conclusion as to the process the State must furnish Meza in all respects except that we do not agree that the State is required to provide Meza with counsel.  Further, we VACATE the district court's order dismissing without prejudice Meza's equal protection and due process claims relating to the non-sex offender conditions attached to his mandatory supervision and REMAND those issues to the district court to decide in the first instance.  We remand the case for entry of an order consistent with this opinion and further proceedings as required.

AFFIRMED, in part,

VACATED, in part,

and

REMANDED.

WIENER, Circuit Judge, concurring in part and dissenting in part.

I concur in the entirety of the panel majority's Opinion with one exception: I must dissent from its failure to specify that qualified and independent assistance — which may be an attorney, but need not be, as spelled out in *Vitek* for mentally impaired *inmates* — must be afforded to a non-sex offender *parolee* like Meza. The class comprising parolees who have never been convicted of sex offenses should be entitled to no less process than is afforded to the class comprising inmates who will remain in custody and merely face transfer from a prison to a mental institution. The disparity in the level of the liberty interest of parolees *vis a vis* that of inmates is significantly greater than the disparity in the relatively small, secondary liberty interest of inmates who, like the one in *Vitek*, merely face being transferred from prison to a mental institution. In comparison, the need for qualified and independent non-lawyer assistance by a mentally competent parolee might well equal or even exceed the need for such assistance by many an inmate with mental issues. Indeed, the case can be made for the proposition that a substantial majority of mentally competent former inmates who are on parole are nevertheless so limited intellectually and so under-educated that their need of such assistance is at least as great as that of many mentally disturbed inmates. When considered in light of the Supreme Court's recognition that the label of sex-offender is the most stigmatizing of all

33

No. 09-50367

those encountered in any of these cases, the panel majority's failure to afford non-attorney assistance to parolees like Meza cannot be justified, particularly given that such assistance can be provided by the State with relatively little difficulty and at relatively modest cost.  Because I conclude that failure to require such assistance for non-sex offender parolees like Meza violates their Due Process rights, I respectfully dissent from the otherwise proper holding of the panel majority.