

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP- 76,445

**EX PARTE JOHNATHAN EVANS, Applicant**

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. B-01-0239-S IN THE 119TH DISTRICT COURT
### FROM TOM GREEN COUNTY

COCHRAN, J., delivered the opinion of the Court in which MEYERS, PRICE, JOHNSON, KEASLER and HERVEY, JJ., joined. KELLER, P.J., filed a concurring opinion. WOMACK, J., concurred.

O P I N I O N

In his application for a writ of habeas corpus, applicant contends that the Texas Department of Criminal Justice–Parole Division (TDCJ) improperly and without due process placed "Special Condition X" (sex-offender conditions) on him after he had been released on mandatory-supervision parole. Based on the evidence in the record before him, the habeas judge entered findings that applicant had not been convicted of a sex offense and that his conviction for Injury to a Child did not involve evidence of sexual abuse. The habeas judge further found that applicant was not afforded constitutional due process before the sex-

offender conditions were imposed.  The judge recommended that this Court grant relief.
Because the record supports the trial judge's findings and his recommendation, we grant
applicant relief.

I.

The judge of the convicting court is the original factfinder in post-conviction habeas
corpus proceedings.  Thus, this Court gives great deference to the convicting court's findings
of fact, conclusions of law, and recommendations, as long as they are supported by the
record.[1]  We consider the evidence and factual conclusions that may be implied from the
evidence in the light most favorable to the habeas judge's findings,[2] and we will afford
almost complete deference to the habeas court's determination of historical facts if they are
supported by the record.[3]  Because the convicting court entered factual findings favorable to
the applicant and recommended that this Court grant relief, we set out the facts in the light
most favorable to the convicting court's recommendation.

---

[1] *See Ex parte Van Alstyne*, 239 S.W.3d 815, 817 (Tex. Crim. App. 2007); *see also Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008) (describing the role of the trial judge in habeas proceedings as "'the collector of the evidence, the organizer of the materials, the decisionmaker as to what live testimony may be necessary, the factfinder who resolves disputed fact issues, the judge who applies the law to the facts, enters specific findings of fact and conclusions of law, and may make a specific recommendation to grant or deny relief'") (quoting *Ex parte Simpson*, 136 S.W.3d 660, 668 (Tex. Crim. App. 2004)).

[2] *Ex parte Wheeler*, 203 S.W.3d 317, 324 (Tex. Crim. App. 2006); *see also Ex parte Simpson*, 136 S.W.3d at 668 (noting that this Court's role is to "*review* the trial court's factual findings and legal conclusions to ensure that they are supported by the record and are in accordance with the law.").

[3] *Ex parte Van Alstyne*, 239 S.W.3d at 817.

On October 29, 2001, applicant pled guilty to two counts of reckless injury to a child involving his two baby girls, Jasmine and Jade Evans. According to the prosecutor who handled the case, at no time "did [he] ever view the case as a sex crime, nor did [he] see anything in the case to indicate any sexual intent or conduct which concerned me."[4] Similarly, the trial judge who presided over the plea stated, "Based upon the trial court's personal recollection of the facts adduced at Applicant's trial, there was no evidence of sexual abuse of Applicant's victims." Both of applicant's two-month-old daughters suffered serious physical injuries while in applicant's care.

Applicant was sentenced to ten years in prison on each count. According to TDCJ records, he was "released to parole"[5] in Lubbock on October 25, 2006, where he lived with his uncle. He was released with SISP conditions[6] and was not allowed to see his children until he took anger-management and parenting classes. Applicant was so successful on parole that–at the seventeenth-month mark–he was removed from all SISP conditions. Because he was then allowed to see his children, he asked to transfer his parole to El Paso so that he could be closer to his daughters. He wanted to become a nutritionist and registered for classes at the El Paso Community College.

---

[4] In his letter concerning applicant, the Assistant District Attorney also stated, "Unless there has been documentation of conduct since the time of his conviction which would indicate reasons for concern, I cannot see a reason to register this convicted felon as a sex offender."

[5] "An inmate released to mandatory supervision is considered to be released on parole." TEX. GOV'T CODE § 508.147(b).

[6] "Super Intensive Supervision Program."

But once applicant arrived in El Paso, his new parole officer gave him a "Notice and Opportunity to Respond Pre-Imposition of Sex Offender Special Conditions." That notice, dated April 16, 2008, stated,

> The file material indicates the offender had been caring for two month old twin daughters. The children were taken to the hospital with broken legs, skull fracture, and bruising on the buttocks. Bright red spots were also found in the vaginas of both victims. The offender claimed he may have wiped them too hard causing the bleeding. He also stated when changing their diapers he would insert his finger in their vaginas in order to be sure there was no feces in their vaginas. He also said he would [pinch] their butts to play with them and this was how the bruising occurred.[7]

Applicant submitted a written response, stating that he was unable to obtain the court records from his daughters' pediatrician that clarified that there were no bruises on the daughters' buttocks; the markings were "strawberry patches" which are frequently found on African and Asian babies. Applicant also stated that the girls' doctor explained in court that the bright red spots on their vaginas were diaper rash because applicant did not clean them sufficiently when changing their diapers. Applicant also clarified that he did not clean his daughters' private parts with his bare finger, but rather with a baby wipe. He stated that the statements written by the El Paso parole officer have been "mistakenly opinionated."[8]

---

[7] There is nothing in the record that explains the source of this information, but presumably it was taken from an underlying offense report and/or medical records. We cannot assess the reliability or context of this information because there is no back-up document to substantiate it. Applicant's counsel states that this information was contained in portions of a very lengthy offense record and medical records, but that it was taken out of context.

[8] Applicant's explanation is consistent with the prosecutor's opinion that applicant's offense did not involve sexual abuse and with the trial judge's similar conclusion.

Nonetheless, applicant's El Paso parole officer recommended that the Board panel impose "Special Condition X"–the Sex-Offender Program. Her transmittal also includes a statement that applicant "was deceptive" during a polygraph examination[9] and that he underwent a psychological evaluation with a "Bill Magee" who recommended that applicant participate in sex-offender counseling.[10] Three days later, on June 13, 2008, the Board panel imposed "Special Condition X."

These sex-offender conditions included, *inter alia*:

- Enroll in and participate in a treatment program for sex offenders;

- Not communicate directly or indirectly with the victims of "the sex offense";

- Not participate in any volunteer activities without prior written approval of the parole officer;

---

[9] The transmittal states that applicant was deceptive when he stated that "he did nothing wrong" that led to his convictions for injury to a child. But that deception says nothing about *sexual* misconduct, as the offense concerned *physical* misconduct.

[10] Again, there is nothing in the record to show what type of evaluation was involved, how long it lasted, or the factual basis for "Bill Magee's" conclusion. Applicant said that this therapist, who had a contractual relationship with the Parole Board, interviewed him for eight minutes. Applicant's attorney stated that Mr. Magee "had a financial interest in finding that Applicant met the criteria for special condition X, due to the fact if Applicant was placed on special condition X, Mr. Magee would provide the treatment classes and receive an income stream based upon Applicant having imposed on him special condition X."

Applicant later submitted a report from Dr. Walter Quijano, a clinical psychologist, who conducted a clinical interview as well as the Millon Clinical Multiaxial Inventory-III (MCMI-III). Applicant tested "in a socially favorable light," but also high for anxiety. He did not appear to meet the criteria of antisocial personality disorder. Dr. Quijano concluded that "there appears to be no basis for classifying [applicant] as a sexual offender." His diagnostic impression was that applicant had "adjustment disorder with anxiety and depressed mood, secondary to imposition of [Special Condition] X." He also diagnosed adult antisocial behavior based on the offense of conviction.

- Not enroll in or attend any institution of higher learning, including a community college, without prior Board approval and notification to the victims of "the sex offense";

- Not view, possess, purchase, or subscribe to any photographs, literature, magazines, books or visual media that depict sexually explicit images;

- Submit to polygraph examinations as approved by the parole officer and Board;

- Not attend any program that includes participants who are 17 years of age or younger or go within 500 feet of anywhere that children commonly gather, including schools, day care facilities, playgrounds, public swimming pools;

- Not become involved in dating, marriage or platonic relationships with anyone who has children 17 years old or younger without written approval by the parole officer;

- Not reside with, have unsupervised contact with, or cause to be contacted, any child 17 years or younger in person, by telephone, correspondence, video or audio device, unless the offender is the legally recognized parent of the child;

- Not own, maintain or operate computer equipment without written authorization from the parole officer;

- Not own, maintain, or operate photographic equipment, including still photos, videos, or any electronic imaging equipment unless approved in writing by the parole officer; and

- Submit to a search of the person, motor vehicle, place of residence, and property, without a warrant at any time, day or night.

Immediately after these sex-offender conditions were imposed, applicant went downhill. He lost his job as a tile-installer because he could not drive to work without going through child-safety zones. He did not dare visit his two daughters because he did not have the parole officer's written approval. He became stressed and anxious because he could not

resume his college work,[11] and he could not use a computer, internet, camera, or film.  He developed headaches, irregular bowel movements, fatigue, and nausea.  His sleep was poor and his appetite low.  He lost fifteen pounds in six months.  He told Dr. Quijano that if "Special Condition X" were not removed, he would put himself back in prison so that he would not be on parole.

On October 16, 2008, applicant's parole officer, along with five other parole officers, came to his home and searched it.  One officer found a cell phone on applicant's bed that had a picture of a nude woman on it.  Several other pictures of nude women were found in his cell phone online photo album.  The six parole officers found various items in a black footlocker, including two pornographic DVDs and two disposable cameras with undeveloped film.  The parole officers also found a Bowie knife in a shoe box.

Four days later, applicant was given notice of a motion to revoke parole, in which the parole officer alleged nine violations, all based upon the results of the search, and all but one of which involved violations of "Special Condition X."  Applicant's *pro bono* attorney filed a Motion to Dismiss Alleged Violations of Conditions of Mandatory Supervision Relating to Special Condition X.  He argued that the conditions had been unconstitutionally imposed without due process and that the facts of applicant's conviction did not justify such sex-offender conditions.  The revocation hearing was held on November 5, 2008.

Applicant's father, stepbrother, stepmother, employer, and uncle all appeared and

---

[11] Previously, applicant had a 3.5 average in his basic classes at community college.

testified on his behalf.  Applicant testified that he had had his cell phone since 2007 when he was in Lubbock and that the parole officer knew about it and had expressed no concern about it.  Joseph Galarza, applicant's stepbrother, testified that the disposable cameras were his and the pictures were of him and his family.  Roxanne Evans testified that she owns the home that applicant had been living in.  She said that the black footlocker belonged to her deceased son, Greg,  and it contained letters written to her other son, Christopher, as well as the two pornographic DVDs, and the cameras and photographs owned by Joseph Galarza.

Nonetheless, the hearing officer found that applicant had violated the sex-offender conditions by his (1) possession of several photographs on his cell phone depicting sexually explicit images; (2) possession of the two pornographic DVDs found in the footlocker; (3) possession of homemade, sexually explicit videos on his cell phone; (4) use of the internet on his cell phone to send and receive sexually explicit images; and (5) possession of a cell phone with still picture and video capability.  The hearing officer found that the other allegations, including the sole non-sex-offender violation, were not proven.

Applicant's attorney filed a Motion to Reopen Revocation Hearing, once again arguing that "Special Condition X" was imposed on applicant without due process of law and without a factual basis. He noted that "the basis to put Applicant on special condition X was three sentences in hundreds (100s) of pages of material related to Applicant's injury to a child offense."  And the parole officer had taken those sentences out of context.

Applicant's parole was revoked, and he was returned to prison.  Eighteen months

later, applicant filed his application for a writ of habeas corpus in the convicting court.

Based upon the evidence in the record, the trial judge made the following findings:

1.  Applicant was not convicted of a sex offense. He was convicted of two counts of injury to a child.

2.  Based upon the trial court's personal recollection of the facts adduced at Applicant's trial, there was no evidence of sexual abuse of Applicant's victims.

. . .

5.  The State imposed Special Condition "X," and thereafter Applicant's parole was revoked for violation of Special Condition "X."

6.  The Trial Court finds that Applicant was not afforded due process before the imposition of sex offender conditions.

## II.

In concluding that applicant was not afforded due process before the imposition of sex-offender conditions, the trial judge relied on the federal district court's reasoning in *Meza v. Livingston*.[12]  In that case, as in the present one, the Texas inmate was released from prison on mandatory supervision parole.[13]  Meza pled guilty to murder of a nine-year-old girl in 1982.[14]  Meza, like applicant, was originally released without any sex-offender conditions attached to his parole.  "Meza lived a relatively normal life within the community," but after approximately fifteen months on parole, he returned "to his residence 15 minutes after his

---

[12] 623 F.Supp.2d 782 (W.D. Tex. 2009), *aff'd in part*, 607 F.3d 392 (5th Cir. 2010).

[13] *Id.* at 785.

[14] *Id.* at 784.

state-imposed curfew."[15]  His parole was revoked, and he returned to prison for eight more years.  When Meza was again released in 2002, the Board imposed numerous special conditions on him, including "Special Condition X."[16]  Meza eventually filed a federal lawsuit, alleging that the Board did not afford him due process in imposing sex-offender conditions as a condition of parole.[17]

Both the federal district court and the Fifth Circuit Court of Appeals agreed with Meza.  The Fifth Circuit's opinion is particularly important because it clarified exactly how much process is constitutionally due before sex-offender conditions may be imposed upon a parolee who has not been convicted of a sex offense.[18]  The court reiterated the holding from its 2004 case, *Coleman v. Dretke*,[19] that a person's "parole may only be conditioned on sex-offender registration and therapy if the defendant is 'afforded a hearing meeting the requirements of due process[.]'"[20] At that hearing, the Board must determine that the parolee "'constitute[s] a threat to society by reason of his lack of sexual control'" before it may impose such conditions.[21]  But the Fifth Circuit's opinion in *Coleman* did not fully set out

---

[15] *Id.* at 785.

[16] *Id.* at 786.

[17] *Id.* at 789.

[18] *Meza v. Livingston*, 607 F.3d 392, 395 (5th Cir. 2010).

[19] 395 F.3d 216 (5th Cir. 2004).

[20] *Meza*, 607 F.3d at 397 (quoting *Coleman*, 395 F.3d at 225).

[21] *Id.*

the constitutional procedures and protections that are required before the Board may impose

sex-offender requirements on a parolee who had not been convicted of a sex offense. In

*Meza*, the Fifth Circuit had determined that the minimal due-process procedures adopted by

TDCJ after *Coleman* were not sufficient to protect the parolee's interest "in being free from

the stigma of registering as a sex offender and avoiding highly invasive sex offender therapy"

as well as "the likelihood of erroneous decision-making."[22]

Accordingly, the Fifth Circuit, after discussing four Supreme Court decisions,[23] held

that "a parolee who has not been convicted of a sex offense"[24] must be afforded the following

procedures before sex-offender conditions may be imposed upon him:

---

[22] *Id.* at 401-03 (concluding that "the current Texas procedures for providing parolees with their *Coleman* notice does not meet the constitutional requirements for due process.").

[23] The *Meza* court, like several other federal circuit courts, *see* note 44 *infra,* discussed four Supreme Court procedural due-process decisions that had crafted a spectrum of greater protections when the "deprivation of the liberty interest leads to stigmatizing and physically-invasive consequences." *Id.* at 404-08 (discussing *Morrissey v. Brewer*, 408 U.S. 471 (1972) (holding that parolees had a liberty interest in avoiding parole revocation and setting out minimum due-process procedures), *Wolff v. McDonnell*, 418 U.S. 539 (1974) (holding that inmates were entitled to due-process protections in prison disciplinary proceedings that could result in the loss of an inmate's good-time credits), *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1 (1979) (only minimal due-process procedures necessary in making the discretionary determination of whether to grant parole), and *Vitek v. Jones*, 445 U.S. 480 (1980) (except for right to counsel, inmate had full panoply of due-process rights set out in *Wolff* and *Morrissey* when prison officials wanted to transfer him to a mental hospital)). The *Meza* court concluded that, "If the deprivation of liberty will cause certain, immediate adverse consequences to the parolee or prisoner, the Court provides more due process than when the deprivation of liberty is uncertain and may occur at a later date. Because fewer security concerns are at issue and the liberty deprivations are more immediate and certain, the Court generally finds that parolees are owed more process than inmates." *Id.* at 408 (citations omitted).

[24] *Id.* at 411.

(1)    written notice that sex offender conditions may be imposed as a condition of mandatory supervision;

(2)    disclosure of the evidence being presented against [the person] to enable him to marshal the facts asserted against him and prepare a defense;

(3)    a hearing in which [the person] is permitted to be heard in person, present documentary evidence, and call witnesses;

(4)    the right to confront and cross-examine witnesses, unless good cause is shown;

(5)    an impartial decision maker;

(6)    a written statement by the factfinder as to the evidence relied on and the reasons it attached sex offender conditions to his mandatory supervision.[25]

The only difference in the reasoning and result reached by the federal district judge and the Fifth Circuit was that the latter held that the State was not required to provide the parolee with counsel for purposes of the evidentiary hearing.[26]

The same minimal due-process procedures found wanting in *Meza* were used in applicant's case. The habeas judge in the present case relied upon the specific holding in *Meza* and also found the following:

> The procedural history of *Meza* [is] very similar to this case. Applicant in this case was not convicted of a sex offense. The State gave notice of intent to impose sex offender conditions–Special Condition "X," but Applicant was not allowed to appear at the hearing, present his own witnesses, nor confront or cross-examine the State's witnesses.

---

[25] *Id.* at 412.

[26] *Id.* at 411, 413 ("Given the substantial cost to the State to provide counsel to parolees facing registration and sex therapy and the Supreme Court precedent discussed above, we conclude that the State is not required to provide counsel to Meza.").

It would certainly seem that the procedural posture in *Meza* is similar to that in this case.[27]
According to the habeas judge, applicant is entitled to the relief that he seeks: immediate release on mandatory supervision without sex-offender conditions, and, if TDCJ seeks to re-impose such conditions, the protection of the *Meza* due-process procedure. But we filed and set this case to invite a response from TDCJ. It has responded and we shall address its arguments.

III.

TDCJ, acting through the Office of the Attorney General, makes four general arguments. First, applicant has received all of the due process he was entitled to under *Ex parte Campbell*.[28] Second, the Fifth Circuit's holding in *Meza*[29] should not be extended to applicant. Third, applicant's due-process rights were not violated because he was revoked for violations unrelated to sex-offender treatment and registration. Fourth, and in the alternative, TDCJ requests an evidentiary hearing in the trial court on the costs of implementing *Meza*. We shall address each argument in turn, beginning with the first two.

---

[27] Of course we are not bound by Fifth Circuit precedent on federal constitutional issues, *Magouirk v. Phillips*, 144 F.3d 348, 361 (5th Cir. 1998) (state courts located in the Fifth Circuit "are not bound by Fifth Circuit precedent when making a determination of federal law").

[28] 267 S.W.3d 916 (Tex. Crim. App. 2008).

[29] *Meza v. Livingston*, 607 F.3d 392 (5th Cir. 2010).

**A.     Our decision in *Ex parte Campbell* followed much of the Fifth Circuit's reasoning in *Coleman*. Now that the Fifth Circuit has clarified *Coleman*, we shall clarify *Ex parte Campbell*.**

In its first two arguments, TDCJ claims that the due-process rights set out in *Meza* apply only to those inmates who were released on mandatory supervision under the pre-1996 law because Mr. Meza himself was released under the pre-1996 law. Now that release on mandatory supervision is discretionary, TDCJ argues, inmates who are released under "discretionary" mandatory supervision are not entitled to due process before the imposition of "Special Condition X."[30] For those releasees, the minimal due-process right to notice and an opportunity to respond set out in our prior decision in *Ex parte Campbell* suffices.

If logic is any guide, this is exactly backwards. Before the enactment of "discretionary" mandatory supervision, all inmates whose good time plus actual time in prison equaled the total length of their sentence were absolutely required to be released on parole.[31] The Parole Board had no discretion to deny release to an inmate even if the Board was certain he would pose a clear and present danger to society.[32] Indeed, Mr. Meza was the

---

[30] TDCJ argues, "Because [applicant] was released to discretionary mandatory supervision, he is not entitled to the additional due process described in *Meza*, which applies only to inmates released to mandatory supervision under the pre-1996 statutes." TDCJ Brief at 8. TDCJ has attached a short, undated, and apparently unpublished, opinion from the Fifth Circuit clarifying its prior opinion in *Meza*, by noting that it addressed the pre-1995 version of the mandatory release statute, not the amended version which made release on mandatory supervision discretionary.

[31] *See* 1977 Tex. Gen. Laws 925 (currently codified, as amended, in TEX. GOV'T CODE § 508.001, et seq.).

[32] *See* House Comm. Report, Bill Analysis, Tex. H.B. 1433, 74th Leg., R.S. (1995) (amending then Tex. Code Crim. Proc. art. 42.18, § 8(c) and adding subsection (c-1), now

"poster child" for the need to enact the 1995 statute[33] that gave the parole board some discretion in denying mandatory supervision release under certain, specific circumstances.[34] Under current law, the Board may deny release to an inmate, who is otherwise eligible for release on mandatory supervision, if it finds that (1) the inmate's accrued good conduct time is not an accurate reflection of the inmate's potential for rehabilitation, and (2) the inmate's release would endanger the public.[35]    Similarly, a parole panel may impose "Special Condition X" upon a parolee only if it determines that the parolee "constitute[s] a threat to

---

codified at Tex. Gov't Code § 508.149) (noting that "mandatory supervision has turned into an automatic open door for prisoners out of the Texas Department of Criminal Justice (TDCJ) institutional division. Once eligible inmates reach an average of 48% of their total sentence, the Pardons and Parole Board has no discretion or decision making power regarding their release. . . . [T]he purpose of this Act is to give the Pardons and Parole Board a lever to close the 'automatic open door' of mandatory supervision. . . . Inmates will not be released to mandatory supervision if the parole panel determines the release of the prisoner would endanger the public."). The amendment creating "discretionary" mandatory supervision was enacted in 1995, but did not go into effect until September 1, 1996.

[33] *See, e.g.,* Bill Minutaglio, *Hating Raul*, Dallas Morning News, Jan. 2, 1994 (Dallas Life), at 6 (lengthy article setting out the history of Meza's murder of Kendra Page, his release on mandatory supervision, and his movement from El Paso, Witchita Falls, San Antonio, Mineral Wells, Sweetwater, and Uvalde as each community expressed outrage at his presence on parole); *Plans to Tighten Procedure on Convicts' Early Release Lauded*, Dallas Morning News, Sept. 19, 1993, at 23A (citing Raul Meza as an example of how early release on mandatory supervision provoked outrage in cities where the state has tried to place him); Lori Rodriguez, *Citizens Weary of Criminal Rights*, Houston Chronicle, Aug. 21, 1993, at A29 (using saga of Raul Meza as rationale for more "anti-crime, anti-criminal and pro-law abiding citizens" laws).

[34] *See generally Ex parte Geiken*, 28 S.W.3d 553, 555 (Tex. Crim. App. 2000) (discussing the 1995 changes to the mandatory supervision statute which became effective Sept. 1, 1996).

[35] Tex. Gov't Code § 508.149(b)(2).

society by reason of his lack of sexual control."[36]

Thus, under the current law, if an inmate poses a threat to society–sexual or otherwise–the Board has the discretion not to release him on mandatory supervision at all, as long as it sets out the specific reasons for that discretionary decision. Of course, as we stated in *Ex parte Geiken*,[37] an inmate does have a protectable liberty interest in release on mandatory supervision because the statute provides that an inmate "shall" be released absent Board action to the contrary.[38] Thus, an inmate must be given timely notice that he will be considered for release on (discretionary) mandatory supervision and an opportunity to tender to the Board information on his behalf in support of release.[39] Notice and an opportunity to be heard is sufficient due process in that situation. As TDCJ correctly notes, in citing *Malchi v. Thaler*,[40] the lowest level of due process (notice and an opportunity to respond) may be

---

[36] *Coleman v. Dretke*, 395 F.3d 216, 225 (5th Cir. 2004) ("The Texas Department of Criminal Justice is authorized by Texas law to impose reasonable conditions on parole to serve the interests of protecting the community and rehabilitating the parolee. When those conditions impact a liberty interest of the parolee, they may be imposed only with justification. The Department may condition Coleman's parole on sex-offender registration and therapy only if he is determined to constitute a threat to society by reason of his lack of sexual control. Absent a conviction of a sex offense, the Department must afford him an appropriate hearing and find that he possesses this offensive characteristic before imposing such conditions.") (footnote omitted).

[37] 28 S.W.3d 553 (Tex. Crim. App. 2000).

[38] *Id.* at 558.

[39] *Id.* at 560.

[40] 211 F.3d 953, 958 n.6 (5th Cir. 2000) ("The new Texas Mandatory Supervision law adds a dimension of discretion to the Mandatory Supervision scheme, providing that if a parole panel determines that the inmate's accrued good conduct time is not an accurate reflection of the inmate's potential for rehabilitation and the inmate's release would endanger the public, he may not be released to mandatory supervision.").

appropriate in the decision to release an inmate on discretionary mandatory supervision because that decision is not a "highly invasive" or "stigmatizing" one, such as the imposition of "Special Condition X."[41]

But applicant *was* released on mandatory supervision because the Board did not find that he posed a threat to society. He was released with SISP conditions, but without "Special Condition X." He abided by his SISP conditions and was released from them after successful completion of parenting and anger-management classes. It was only after he had been a successful parolee for eighteen months that his new El Paso parole officer set in motion the procedure to impose sex-offender conditions on him.

It would certainly seem logical that a person who has already been released from prison because he did not constitute a threat to society is entitled to more due process protection from imposition of sex-offender conditions than a person who, like Meza, was required to be released from prison regardless of how grave a threat he might pose to society. Indeed, the Fifth Circuit's opinion in *Meza* stated that "if Meza were an inmate instead of a parolee, the *Wolff* standard [the same due-process standard that the *Meza* court adopted] would likely apply" to the decision to treat him as a sex offender.[42] If an inmate is entitled

---

[41] *See Coleman*, 395 F.3d at 223-25.

[42] *Meza v. Livingston*, 607 F.3d at 409. The Fifth Circuit stated that "Meza can claim at least the same process of an inmate, but as a parolee, he should generally be entitled to more favorable treatment than inmates." *Id.* The court also noted that "the Board already provides parolees with written notice that sex-offender conditions may be imposed as a condition of parole. Similarly, the decision to impose sex-offender conditions is currently made by the Board, an impartial decision maker. The other requirements listed here, however, are not currently part

to those due-process protections, surely a parolee who had already been discretionarily released because he did not pose a danger to society is entitled to those protections.  As the Fifth Circuit stated, "Because fewer security concerns are at issue and the liberty deprivations are more immediate and certain, the [Supreme] Court generally finds that parolees are owed more process than inmates."[43]  Nor is there any hint or suggestion in the *Meza* opinion that its reasoning or result should logically apply to those who are required to be released under the pre-1996 amendments, but not to parolees or those released on discretionary mandatory supervision.  The liberty interest of all three groups is the same,[44] and the risk of an erroneous decision is the same.

---

of the Board's procedures."  *Id.* n.14.  The Fifth Circuit's message appears to be that its due-process procedural requirements set out in *Meza* apply to all inmates who might be paroled or released on mandatory supervision.

[43] *Id.* at 408.

[44] As the Fifth Circuit stated in *Coleman*, "We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender." 395 F.3d at 223 n.27 (internal quotation marks and citation omitted).  Several other federal circuits have held the same in requiring due-process procedural protections and evidentiary hearings before labeling either an inmate or releasee a "sex offender" and imposing special conditions upon him as a result.  *See, e.g., Renchenski v. Williams*, 622 F.3d 315, 326-31 (3d Cir. 2010) (holding that only after due process has been afforded may sex-offender conditions be imposed on an inmate who has not been convicted of a sexual offense because "[i]t is largely without question-and Defendants do not claim otherwise-that the sex-offender label severely stigmatizes an individual, and that a prisoner labeled as a sex offender faces unique challenges in the prison environment"; setting out *Meza*-like due-process procedures that must be afforded the prison inmate prior to such labeling); *Kirby v. Siegelman*, 195 F.3d 1285, 1292 (11th Cir. 1999) (Due Process Clause gave rise to an independent liberty interest in not being labeled a sex offender; "[a]n inmate who has never been convicted of a sex crime is entitled to due process before the state declares him to be a sex offender.");  *Neal v. Shimoda,* 131 F.3d 818, 831 (9th Cir. 1997) (before an inmate who has never been convicted of a sex offense may be labeled as a "sex offender," he "is entitled to the procedural protections outlined by the Supreme Court in *Wolff* [*v. McDonnell*, 418 U.S. 539 (1974)]").

TDCJ argues that the bare-bones due-process procedure of notice and an opportunity to respond that we set out in our decision in *Ex parte Campbell*–a case dealing with the imposition of sex-offender conditions on a releasee who had a prior sex-offense conviction of some type–also suffices for those released on discretionary mandatory supervision who have no prior sex-offense convictions.[45]  But as the concurrence in *Ex parte Campbell* explicitly noted, we adopted this "minimal" due-process standard because *Coleman* "did not elaborate on precisely what type of notice and hearing would suffice to support a parole board's finding that a parolee would 'constitute a threat to society by reason of his lack of sexual control.'"[46] Now that the Fifth Circuit has elaborated on the specific type of notice and hearing that is required in this situation, we shall once again follow its lead, not because we must do so, but because the reasoning of the Fifth Circuit is persuasive and is consistent with that of several other circuit courts.[47]

**B.    Applicant was revoked only for violations related to "Special Condition X."**

As its third argument for why applicant should not obtain relief, TDCJ argues that applicant's parole was not revoked specifically for violations of "sex-offender treatment." True enough, but applicant was revoked because of the violation of conditions contained in "Special Condition X."   And, as applicant argues, *none* of those sex-offender conditions

---

[45] In *Campbell*, the inmate had a prior conviction for indecent exposure.  267 S.W.3d at 918, 921-23.

[46] 267 S.W.3d at 933 n.6 (Cochran, J., concurring).

[47] *See* note 44 *supra.*

should have been imposed on him without the due-process procedures required by *Meza*.

TDCJ relies on the Fifth Circuit's decision in *Williams v. Ballard*,[48] in which the court agreed

that the parolee was entitled to due process under *Coleman* before he could be required to

register as a sex offender. The court also noted in passing that the parolee had originally

challenged other conditions that were a part of "Special Condition X," but that he did not

appeal the district court's ruling that only the registration and therapy components raised due-

process concerns.[49] The Fifth Circuit simply noted that it "had no occasion to address other

[sex-offender] conditions" in *Coleman*.[50] In *Meza*, however, the Fifth Circuit addressed the

due-process protections required before imposing "sex offender conditions" as a general

matter. We do not read its opinion as dealing solely with one or two of the conditions of

"Special Condition X," but rather the entire panoply of stigmatizing and highly invasive

requirements of "Special Condition X." The Fifth Circuit posed the crucial issue in its first

paragraph:

> Texas parolee, Raul Meza, who has never been convicted of a sex offense,
> sued [the TDCJ defendants] for violations of his right to due process after the
> defendants attached *sex offender conditions* to his mandatory supervision.
> This court has made clear that *sex offender conditions* may only be imposed on
> individuals not convicted of a sex offense after the individual has received due
> process. Meza alleges that before *sex offender conditions* were attached to his
> mandatory supervision, inadequate process was provided. Thus, this case
> requires us to determine whether the process utilized by the defendants in this

---

[48] 466 F.3d 330 (5th Cir. 2006).

[49] *Id.* at 332 n.2.

[50] *Id.*

case is constitutionally sufficient.[51]

From this introductory paragraph and the lengthy discussion and constitutional analysis that follows, we cannot conclude that the Fifth Circuit intended that the due-process requirements applied only to one or two of the sex-offender conditions set out in "Special Condition X."

TDCJ also cites an apparently unreported district court order, *Carter v. Thaler*,[52] for the proposition that a person's parole may be revoked for grounds other than a violation of the "Special Condition X" terms, even though the parolee argues that imposition of sex-offender conditions without due process was improper. Well, of course. If applicant's parole had been revoked for possessing an illegal Bowie knife (as was originally alleged, but not proven), he would have no basis to complain about his revocation. Here, however, all five of the violations that applicant was found to have committed were conditions imposed by "Special Condition X." Applicant's parole was revoked solely because of the sex-offender conditions that were imposed upon him without due process and against which he has protested at every step of the way.

### C.    We need not remand for another hearing concerning the fiscal impact of *Meza* on TDCJ.

TDCJ argues here, just as it did in the federal district court and the Fifth Circuit, that it is too expensive to provide a due-process evidentiary hearing before imposing sex-offender conditions on those who have never been convicted of a sex offense. TDCJ states that

---

[51] *Meza*, 607 F.3d at 395 (internal citation to *Coleman* omitted; emphasis added).

[52] No. A-10-CA-065-LY (W.D. Tex. Jan. 6, 2011) (not designated for publication).

approximately 33,000 inmates were released last year on parole, mandatory supervision, or discretionary mandatory supervision. But that number is irrelevant as it includes the entire cohort of releasees, including DWI felons, drug addicts and dealers, thieves, and all manner of non-sex offenders. The relevant figure is the number of potential releasees who have not been convicted of a sex offense, but for whom TDCJ seeks the imposition of "Special Condition X." And surely that is a very small number indeed because TDCJ may refuse to release those inmates (subject to discretionary mandatory supervision or parole) who currently pose a threat–sexual or otherwise–to society.

In *Meza*, the district judge noted that the "State argues that it will be financially burdensome to increase procedural protections for offenders whose parole it hopes to condition on sex-offender-conditions."[53] The district judge rejected TDCJ's analysis and concluded that "affording additional protections to Meza and others similarly situated would not be a significant burden on the State."[54] Similarly, the Fifth Circuit stated that TDCJ Board witnesses predicted that there were currently 6,900 prisoners who will potentially need to receive *Coleman* notice before their release.[55] But after balancing the additional costs to TDCJ against the parolee's liberty interest and the likelihood of erroneous decision-making

---

[53] 623 F.Supp.2d at 793.

[54] *Id.* In a note, the district judge cited the additional staff and costs that TDCJ testified would be incurred by providing due process, but expressed skepticism that "so many additional employees would be necessary to add elements to extant procedures." *Id.* at 793 n.20.

[55] 607 F.3d at 403.

without appropriate due-process protections, the Fifth Circuit concluded that the present procedures–the ones used in *Meza* and in the present case–were unconstitutional.[56]

Therefore, we agree with the habeas judge in this case that, under *Meza*, applicant is entitled to the relief he seeks: immediate reinstatement of his release on mandatory supervision and removal of "Special Condition X" from the terms of his parole.  The mandate shall issue on this date.  A copy of this opinion shall be delivered to TDCJ.

Delivered: May 4, 2011
Publish

---

[56] *Id.*  The court explained that
> The grave risk of error that envelops the procedures used by the Board is most troubling. By not allowing the parolee to review the evidence presented against him, he is unable to correct any misinformation placed in his packet that the Board reviews. By not allowing the parolee to appear before the Board, the Board must act without mitigating or clarifying evidence from the parolee. By not allowing the parolee to confront opposing witnesses, the parolee is unable to refute damning statements made against his interest and the Board is unable to evaluate the credibility of the parolee against that of opposing witnesses.

*Id.*  Indeed, that is precisely what applicant asserts in the present case.  If the original trial prosecutor and judge can be credited, TDCJ made an inaccurate decision in concluding that applicant was a sex offender, and it made that decision because applicant was not allowed to see the evidence against him, call witnesses, cross-examine the witnesses against him, and have a neutral factfinder enter specific findings based on the evidence.  This case is a good example of why the procedural protections adopted in *Meza* are essential to enhance the accuracy of a decision as to whether a person who has not been convicted of a sex offense is, nonetheless, a sex-offender who should be subjected to the invasive and stigmatizing "Special Condition X."