IN THE COURT OF CRIMINAL APPEALS
OF TEXAS



NO. WR-64,302-02

                                                        

EX PARTE OBIE D. WEATHERS, Applicant




ON APPLICATION FOR A WRIT OF HABEAS CORPUS
CAUSE NO. 2000-CR-2916 IN THE 399TH DISTRICT COURT 
                                               FROM BEXAR COUNTY



           Alcala, J., filed a concurring statement in which Cochran, J., joined.

CONCURRING STATEMENT 

           I join this Court’s order holding that, in his subsequent application for a writ of habeas
corpus, Obie Weathers, applicant, has failed to show by clear and convincing evidence that
he is mentally retarded and ineligible for execution under the Eighth Amendment of the
federal Constitution. See Atkins v. Virginia, 536 U.S. 304, 321, 122 S. Ct. 2242 (2002); see
also U.S. Const. amends. VIII, XIV. I write separately to elaborate on the mental-retardation evidence presented at the hearing on applicant’s writ that, though conflicting,
when viewed in combination with the habeas court’s credibility assessments, supports most
of the habeas court’s findings and conclusions and its recommendation to deny relief. 
           A. Standard of Review for Post-Conviction Subsequent Writ Atkins Claims
           Because applicant’s initial writ application was filed post-Atkins, we review the merits
of applicant’s mental-retardation claim in this subsequent application for clear and
convincing evidence that no rational fact finder would fail to find him mentally retarded. Ex
parte Blue, 230 S.W.3d 151, 163 (Tex. Crim. App. 2007). Mental retardation is established
by proof of significantly sub-average general intellectual functioning, concurrent with related
limitations or deficits in adaptive functioning, that originates during the developmental
period of life. Ex parte Briseno, 135 S.W.3d 1, 6–7 (Tex. Crim. App. 2004). Moreover,
applicant must prove that the first and second prongs “are linked—the adaptive limitations
must be related to a deficit in intellectual functioning and not a personality disorder.” Ex
parte Hearn, 310 S.W.3d 424, 428–29 (Tex. Crim. App. 2010) (citing factors set out in
Briseno as “evidentiary factors” to “help distinguish” mental retardation from personality
disorders). 
           This Court is the ultimate finder of fact with regard to habeas claims, although the
habeas judge is “uniquely situated to observe the demeanor of witnesses firsthand and his
findings and conclusions are generally accorded great deference” when supported by the
record. Ex parte Flores, 387 S.W.3d 626, 634–35 (Tex. Crim. App. 2012) (citations
omitted); Ex parte Reed, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008) (noting that habeas
court is “in the best position to assess the credibility of witnesses,” and extending deference
to individual sentences and phrases in the findings and conclusions “that are grounded in the
record”). 
           B. The Habeas Record on Applicant’s Atkins Claim
           The record of applicant’s habeas hearing shows that applicant presented the testimony
of six witnesses: Dr. Joann Murphey, a clinical psychologist, who assessed applicant for
mental retardation in 2011; Ms. Caruso, applicant’s sixth-grade reading teacher; Ms. Logan,
applicant’s tenth-grade home economics teacher; Ms. Donaldson, a vocational consultant
who assessed applicant’s work history; Mrs. Weathers, applicant’s mother; and Mr. Hill,
applicant’s employer for two years prior to his arrest for capital murder. Also introduced in
evidence was Dr. Murphey’s report that included applicant’s full scores on the Wechsler
Adult Intelligence Scale, Fourth Edition (WAIS-IV) and, subsequently, on the Stanford-Binet
Intelligent Test, Fifth Edition (SB5) and Adaptive Behavior Assessment System, Second
Edition (ABAS-II). Dr. Murphey’s report included a review of applicant’s 2008 assessment
by another psychologist, Dr. Jesse Reed, who used the third edition of the Wechsler test
(WAIS-III), but his report itself was not included. The State introduced the testimony of Dr.
Joseph Sparks and submitted applicant’s school records, prison letters, and recordings of his
phone conversations while in jail. On the State’s request, the court also took judicial notice
of the trial record.
           Following the hearing, the habeas court signed the State’s proposed findings of fact
and conclusions of law. Although these were in narrative form and not individually
numbered, I set out below those relevant findings and conclusions ordered in accordance
with the three diagnostic criteria for mental retardation. See Briseno, 135 S.W.3d at 6–7. 
           1. The Record Shows Conflicting Evidence of Sub-Average General Intellectual Functioning

           I agree with the habeas court’s finding that, on this record, “conflicting” evidence
existed of applicant’s IQ score with respect to whether there was evidence of sub-average
general intellectual functioning.


 As Dr. Murphey explained, the clinical definition of the
IQ score range for mild mental retardation spans up to 75 under the standard error of
measurement. The court was provided three full-scale IQ test scores of applicant, namely,
his 2008 WAIS-III score of 79 and his 2011 WAIS-IV and SB5 scores of 53 and 65,
respectively. With regard to the WAIS-IV score, Dr. Murphey testified at the hearing that
she subsequently gave applicant the SB5 test because applicant’s score of 53 on the WAIS-IV was “so low I was sure he was not functioning to his capacity.” She testified that
applicant passed the malingering test and was highly motivated, although on cross
examination she acknowledged that this could be consistent with a manipulative test subject. 
Regarding applicant’s WAIS-III score, applicant contends in his brief that Dr. Reed had
modified this score to 73.66 to accommodate the Flynn Effect and the standard error of
measurement, but did not provide Dr. Reed’s report in the record. Although not specifying
the revised WAIS-III score, Dr. Murphey cited with approval Dr. Reed’s application of the
Flynn effect


 and the standard error of measurement and concluded that the resulting score
fell into the IQ range for mild mental retardation. Regarding Dr. Reed’s test data, however,
Dr. Murphey noted that scoring for some questions is subjective since they “aren’t in the [IQ
test scoring] book,” and she “took his findings as his findings.” As for whether the testing
conditions were ideal, Dr. Murphey did acknowledge that applicant’s physical environment
on death row for ten years and applicant’s “overall situation itself” were likely very stressful. 
The State’s expert, Dr. Sparks, also testified that isolation on death row could lower a
prisoner’s performance on an IQ test.  
           From the habeas court’s findings that the evidence is “conflicting,” it appears the court
credited the evidence indicating that applicant’s scores did not show he was mentally
retarded. His WAIS-III score of 79 would not fall within the range of mild mental
retardation, in contrast to his later SB5 score of 65. See American Psychiatric
Association, Diagnostic and Statistical Manual for Mental Disorders 41–42 (4th
ed. Text Revision 2000). Although Dr. Murphey testified that she and Dr. Reed would
diagnose mild mental retardation based on applicant’s WAIS-III score after correcting for
the Flynn Effect and the standard error of measurement (SEM), the habeas court appears to
have discredited that evidence in finding that the “‘Flynn effect’ has never been given effect
by any appellate court in Texas,” and its conclusion that “even if the Flynn effect were to be
factored . . . applicant has still not met his burden of demonstrating that his IQ . . . was in the
mentally retarded range” because his lack of stimulation on death row would explain his
lower IQ scores. In light of the court’s separate finding that applicant’s score of 65 was
artificially lower than it should have been, the court evidently found that applicant’s higher
score outside of the clinical range of mild mental retardation was a more accurate indicator
of his general intellectual functioning.     
           2. The Record Shows Scant Evidence of Deficits in Adaptive Functioning
           I also ultimately agree with the court that, on this record, applicant presented “little”
or “scant” evidence of deficits in adaptive functioning.


 In my view, the record on adaptive
deficits does not support the court’s finding that Dr. Murphey failed to interview “a broad
enough range of people.” I find that the record does, however, otherwise support the court’s
findings with respect to applicant’s adaptive functioning when assessed in terms of his ability
to live independently, his potential for having an antisocial personality disorder, his work
history, and his school performance. 
           As Dr. Murphey noted at the hearing, in general, “adaptive functioning is very
difficult to measure in people with intellectual deficits, because many of them have never
lived independently.” Furthermore, Dr. Murphey stated that adaptive strengths and deficits,
capable of coexisting, are both considered in assessing mental retardation. She described
adaptive functioning as meaning “self-help skills,” such as “can you get up, get yourself
bathed, dressed appropriately”; “can you get [to a destination on time], can you use public
transportation”; and “know[ing] how to behave in a particular situation, at work, just what
we might call manners or social expectations[.]” Consequently, she opined that “work
experience” is one “very good” indicator of adaptive functioning and that, without direct
observation of an individual’s cognitive abilities and limits, a mentally-retarded person may
engage in defensive “masking” behavior. She also acknowledged that a person may
simultaneously possess multiple disorders such as antisocial personality disorder and mental
retardation. 
            The record evidence about applicant’s living skills, intelligence, and likelihood of
suffering from an antisocial personality disorder supports that applicant does not suffer
adaptive deficits such as to indicate he is mentally retarded. Dr. Murphey concluded that
applicant’s ABAS-II scores demonstrated adaptive deficiencies in three areas—social,
academic, and functional communication—based on her interviews of applicant’s mother,
grandmother, and one teacher, and on the affidavits of six other relatives and acquaintances
of applicant. On cross-examination, she acknowledged that on the general facts of
applicant’s crimes, antisocial personality disorder was a possible alternative or concurrent
diagnosis. Furthermore, Dr. Murphey acknowledged that applicant was “capable of taking
care of himself” while living with his sister. That he managed to hide his drug use and
criminal conduct from his sister and their mother, Dr. Murphey agreed, could be consistent
with someone who is “manipulative and who knows how to work the system.” She also
noted that applicant’s ABAS-II scores based on ratings of his adaptive functioning by several
of his family members and friends had some significant variations between the different
participants.


 
           Furthermore, the record evidence on applicant’s substantial capacity to communicate
supports his lack of adaptive deficits in that area. After listening to some of applicant’s
recorded jail phone calls, Dr. Murphey also acknowledged that the direct evidence could
support that applicant spoke at a sixth-grade level and “in some areas it would appear above
that.” In particular, in “the area of art [applicant] perceives himself as a great artist, as
someone who’s very interested in art and he knows the names of some artists,”
communicating such that “if you listened to just segments about art that it would—could be,
I don’t know, Michelangelo talking . . . someone of maybe average intelligence might be
talking or maybe even above average because he’s very focused in that area.” Dr. Murphey
noted, however, that she saw “masking” in this behavior in the sense that applicant believed
himself “special, gifted, [and] desirable.” Dr. Sparks, in contrast, opined that applicant’s
statements and vocabulary about “meanings and the emphasis on certain aspects of art”
would constitute “a complex subject,” the discussion of which would normally be beyond the
capacity of individuals with mild mental retardation. Dr. Sparks also took note of applicant’s
conversations calculating and soliciting funds for a prison television, making plans for a third
party to send him an item while in jail, and discussing the legal aspects and potential
outcomes of his pending habeas proceedings.
           In sum, the evidence of applicant’s living and communicative skills supports the
court’s findings of “little” evidence of mental retardation in favor of applicant’s possessing
“at least average intelligence” and showing “signs of Antisocial Personality Disorder.” This
support was adequate for the court to disbelieve Dr. Murphey’s assessment, based on
applicant’s ABAS-II scores, that he was deficient in social, academic, and communication
adaptive functions. In particular, applicant’s letters and recorded calls directly portrayed an
individual capable of learning and communicating about abstract concepts, including the
various aspects and meanings of Picasso’s Guernica or whether the collection at The
Guggenheim Museum contained any signed works by Jackson Pollock, a detailed plan for
receipt of a package in prison to be sent by a third party, and calculating his available funds
to plan for an anticipated purchase of a high-cost television for his jail cell. I also agree with
Dr. Murphey that the facts of applicant’s crimes, which included the sexual assault of an
elderly man with a broomstick handle during a robbery of the man’s house after which
applicant forced him to taste the object, could support the coexistence or alternative existence
of an antisocial personality disorder, which would explain his adaptive deficits on a basis
other than mental retardation.
           The habeas court’s findings receive further support from the record’s evidence on 
applicant’s adaptive functioning through his work history. The record contains several
witnesses who testified that applicant was a capable and successful employee. Dr. Murphey
testified that applicant’s overall job history showed that “certainly he was employable” and
that his history of work for Hill over several years was a “good one.” Hill testified that
applicant, who worked for him at his restaurant for two years, was initially a waiter but was
reassigned to kitchen duties because he was somewhat “clumsy” and did not adequately take
orders from customers. Hill did not assign the fifteen-year-old applicant to work the fryer
or cash register because it was “dangerous” or “it wasn’t his job,” and acknowledged that
although applicant learned from his mistakes, he was “a slow learner” and a follower of the
older employees. Furthermore, Hill noted that he had rehired applicant after initially
suspending him from work for “not showing up” and briefly promoted him to a night
supervisor position to teach him greater responsibility, although he ultimately fired applicant
after applicant’s “excellent” work became poor again, possibly due to drug use. In contrast,
Donaldson, a vocational consultant, opined that applicant performed as a preparation cook,
a job that a person with mild mental retardation could do. She agreed that a person with mild
mental retardation could receive a promotion similar to the one obtained by applicant. 
Applicant’s mother also testified that applicant sometimes drove to work although he had
never earned a driver’s license because he could not pass the test, and that as a teenager he
overdrew on his checking account multiple times. 
           The habeas court’s finding that applicant has failed to show that any adaptive deficits
are due to mental retardation is supported by the evidence, which shows that he had
“excellent” job performance for Hill, his demotion and termination by Hill were attributable
to his failures to show up for work and to perform adequately due to illegal drug use, and his
ability to acquire a telemarketing job following his termination by Hill where he worked until
his arrest for the instant offense. Furthermore, I conclude that the convicting court’s
adaptive-deficit findings are supported by the record evidence regarding applicant’s
academic skills. Dr. Murphey acknowledged that, on applicant’s school records, which I
discuss more fully below, several of applicant’s teachers “thought that he could do the work
and just wouldn’t.” In light of this and the recordings and letters in evidence, including
applicant’s discussion of his potential re-sentencing after the court’s determination on his
Atkins claim, I would agree with the court that, based on the record, applicant demonstrated
“at least average intelligence.” 
3. The Record Shows A Lack of Evidence Supporting The Onset of Mental
Retardation Before Applicant Was Eighteen Years of Age

            Taking into account the habeas court’s assessment of the credibility of the evidence
supplied by Dr. Murphey and the anecdotal evidence provided by applicant’s teachers, the
record supports the habeas court’s finding that there is no credible evidence that shows that
applicant was mentally retarded before the age of 18.


 Dr. Murphey testified that she
compiled a “developmental history” including applicant’s school performance, such as his
grades and whether he was “in any kind of special education” or “identified in any way as
having a problem.” Extrapolating from applicant’s selected academic records and affidavits
of his “teachers or a teacher,” Dr. Murphey concluded that onset occurred before age 18. 
With regard to the Briseno factors, she opined that many in applicant’s community
considered him mentally retarded; that applicant was capable of creating and executing
simple, but not complex, plans; that he was not a leader; and that “often” his conduct was
irrational or inappropriate although his ability to respond coherently and rationally existed
“[i]n some areas.” She observed that applicant could “and does often” tell simplistic lies but
perhaps does not “consistently cover those lies” or maintain them, and that the crime of
which applicant was convicted did not entail “complex execution.” 
           On cross-examination, however, Dr. Murphey acknowledged that applicant’s
childhood psychological records had been destroyed by the time of her assessment, and she
did not know the basis for applicant’s placement in special education classes. She admitted
that applicant’s crimes, if committed alone, would not support that he was a follower. 
Furthermore, applicant’s elementary, middle school, and high school disciplinary records
contained consistent notices of his behavioral problems and his failures to turn in
assignments. Although Dr. Murphey noted that applicant’s grades became worse after he
was removed from special-education classes from middle school onward, she acknowledged
that he continued to obtain occasional As, Bs, and Cs even into high school. She also
acknowledged that Dr. Reed’s report found that applicant was placed in special education
for a “learning disability,” which “you can have . . . with any intellectual IQ score.” 
           Given the lack of documentation explaining the reason for applicant’s placement, I
agree with the habeas court’s finding that there was “no way to tell” if applicant’s placement
in special education was based on applicant’s being mentally retarded or having another
condition. The court found “stronger evidence” that applicant’s placement involved his
having Attention-Deficit Hyperactive Disorder. Although the record is scarce with respect
to this matter, what little exists supports the court’s findings. In general, applicant’s
disciplinary record provides signs of consistently disruptive behavior and grades that, though
generally poor, are speckled with isolated outstanding scores. Regarding his placement in
special education, Dr. Murphey concluded that applicant’s placement was likely as a result
of mild mental retardation. She acknowledged, however, Dr. Reed’s assessment, based on
a school form in the record designating applicant as “LD,” that applicant was referred for
special education because he had a learning disability, a different diagnosis than mental
retardation under the DSM-IV-TR.


 
           With regard to applicant’s teachers’ assessments of his developmental cognitive
limitations, the testimony offered about applicant’s academic performance was conflicting. 
Caruso, who taught applicant in a sixth-grade reading class, testified that applicant was
constantly disruptive. On cross-examination, she acknowledged that she gave him an 86
despite his working at a second-grade reading level. Logan testified that applicant was
always polite and well-dressed in her regular home economics high school class, but stated
that he worked at a sixth-grade reading level and earned a 64 despite having his assignments
modified to make them easier. She also testified that applicant was not a leader and struggled
with math and measurements. On cross-examination, she stated that applicant was classified
as special education in high school but acknowledged that applicant’s low grades reflected
that he did not turn in some of his assignments. 
           The habeas-court judge assessed the credibility of the evidence and found less
persuasive Dr. Murphey’s characterization of applicant’s school performance as indicative
of mental retardation as compared to the other evidence showing that applicant’s placement
in special education and marginal school performance were for reasons other than mental
retardation. Deferring to the habeas court as to the credibility and weight of the evidence,
applicant did not show that he had mental retardation before his eighteenth year of age. 
           4. The Record Supports that Dr. Murphey’s Credibility Was Undermined
           Having addressed the court’s general findings regarding applicant’s claim, I now
address its separate findings about Dr. Murphey’s credibility, which the court found was
“undermined in several ways.”


 The ways listed included that Dr. Murphey characterized
certain adverse facts and testimony as not helpful to her assessment of applicant, including
the fact that applicant had occasionally received good grades, that in applicant’s disciplinary
reports his teachers opined that he was academically capable, and that Hill’s testimony at the
habeas hearing differed from his affidavit on which her report relied. The habeas court
additionally cited Dr. Murphey’s acknowledgment that applicant’s work history was “good,”
and that, on the facts of applicant’s crimes, Dr. Murphey’s testimony would not support her
opinion that he was a follower. 
           I find that the record does not support the habeas court’s finding that Dr. Murphey
testified she failed to find helpful teacher assessments of applicant’s intellectual capacity. 
Dr. Murphey acknowledged that “certainly you want to know everything you can know” but
clarified that “[school] principals are not diagnosticians,” and stated that it would have been
helpful to know “if there had been standardized instruments administered” to assess
applicant’s need for special-education classes in high school. Contrary to another of the
court’s findings, the record shows that Dr. Murphey did note that she “would want to know
why the difference” between Hill’s testimony at applicant’s trial and his affidavit in her
report. However, the record supports the habeas court’s other findings as to Dr. Murphey’s
credibility and consequently, that is a determination to which this Court may defer. 
C. Deference to the Convicting Court’s Recommendation is Warranted by the
Record That Supports the Court’s Findings and Conclusions

           In light of the above record evidence, I conclude that most of the habeas court’s
findings and conclusions, and its recommendation to deny relief, are supported.


 In making
its legal determination, the habeas court applied the wrong standard of proof to applicant’s
writ by using a preponderance standard. Applicant nevertheless has failed to meet the proper
standard of clear and convincing evidence. See Blue, 230 S.W.3d at 163. We must consider
the evidence and implied factual conclusions from it in the light most favorable to the habeas 
court’s findings and conclusions, and we give almost complete deference to the court’s
determination of historical facts if supported by the record. Ex parte Evans, 338 S.W.3d 545,
546 (Tex. Crim. App. 2011). We especially afford such deference to habeas findings when
they are based upon an evaluation of credibility and demeanor. Ex parte Amezquita, 223
S.W.3d 363, 367 (Tex. Crim. App. 2006); see also Ex parte Kimes, 872 S.W.2d 700, 701
(Tex. Crim. App. 1993). On the basis of Dr. Murphey’s undermined credibility, the habeas
court was not persuaded by her evidence regarding applicant’s suffering significantly sub-average general intellectual functioning, concurrent with related limitations or deficits in
adaptive functioning, that originated during applicant’s developmental period. Briseno, 135
S.W.3d at 12–13. Because that conclusion and most of the court’s general factual findings
are supported by the record, we properly defer to the court’s determinations. With these
comments, I respectfully join in the Court’s order denying relief.
Filed: April 30, 2014
Do Not Publish